UNITED STATES of America
v.
Charles D. MOELLER et al.
Crim. No. N–75–59.

United States District Court,
D. Connecticut.
Oct. 7, 1975.

Peter C. Dorsey, U. S. Atty., William F. Dow, III, Asst. U. S. Atty., New Haven, Conn., for plaintiff.

Theodore I. Koskoff, Bridgeport, Conn., William H. Clendenen, Jr., Dennis E. Curtis, New Haven, Conn., Thomas D. Clifford, Hartford, Conn., Gregory B. Craig, New Haven, Conn., David S. Golub, Stamford, Conn., Rudolph Lion Zalowitz, Hackensack, N.J., Alan Neigher, Andrew B. Bowman, J. Daniel Sagarin, Bridgeport, Conn., for defendants.

## MEMORANDUM OF DECISION ON PRE-TRIAL MOTIONS

NEWMAN, District Judge.

In this criminal prosecution arising out of the alleged arson of the Sponge Rubber Products Co. plant in Shelton, Connecticut, scores of pre-trial motions have been filed, three of which require extended discussion since they raise important and troublesome issues.

### I

The first set of motions concerns the required scope of the government's response to allegations of wiretapping. Defendants Moeller, Dennis Tiche, Michael Tiche, Just, and Bubar have moved for disclosure of any electronic surveillance. None of these motions alleges anything; they simply make inquiry. In addition, defendants Just, Michael Tiche, and Dennis Tiche have moved to suppress evidence derived from electronic surveillance. These motions allege "on information and belief that the defendant's conversations have been overheard by means of electronic surveillance." Finally, defendant Bubar has also moved to suppress evidence derived from electronic surveillance, but without any allegation that such has occurred.

Presumably the defendants are seeking to invoke 18 U.S.C. § 3504, requiring the government to "affirm or deny" electronic surveillance "upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act . . . ."

█ In this Circuit, the assertion of wiretapping is apparently sufficient to trigger the government's obligation under § 3504. *United States v. Toscanino,* 500 F.2d 267 (2d Cir. 1974); *In re Grusse,* 402 F.Supp. 1232 (D.Conn.), *aff'd sub nom., United States v. Grusse,* 515 F.2d 157 (2d Cir. 1975). But see *In re Buscaglia,* 518 F.2d 77 (2d Cir. 1975).

To discharge its obligation, the government has submitted several affidavits in which the United States Attorney and other officials deny that any electronic surveillance occurred in the investigation of this case and also affirmatively aver that all the government's evidence has been obtained from "direct" sources. Affidavits have been submitted by F.B.I. agents in New York City, Cleveland, Chicago, Pittsburgh, Memphis, New Haven, and Washington, D. C., the Connecticut state police officer with responsibilities for investigation of the case, and the Shelton police chief. At oral argument, the defendants challenged the sufficiency of these denials, contending that other government agencies, such as the Alcohol, Tobacco, and Firearms Division of the Treasury Department, the Central Intelligence Agency, and the National Security Agency should also have been checked.

The scope of a government check necessary to satisfy the obligation of § 3504 has not been clarified in this Circuit. *United States v. Grusse, supra,* a civil contempt proceeding against a grand jury witness, approved a check limited to the agency investigating the case, though the concurring opinion of Judge Lumbard urged further inquiries as a "salutary practice." 515 F.2d at 159 n. 1. Broader inquiries have, of course,

been made. See *United States v. Aloi,* 511 F.2d 585, 602 (2d Cir. 1975).

In *Grusse* this Court was persuaded of the sufficiency of a check limited to the agency that had investigated the case because the slight risk of some undetected wiretapping was outweighed by the grand jury's legitimate interest in the prompt conduct of its business. That factor also weighed heavily with the Court of Appeals. 515 F.2d at 158. A second factor militating against a broader inquiry, relied on in Judge Lumbard's concurring opinion, was the high likelihood that the United States Attorney handling the case and the F.B.I. agent in charge of the investigation would know whether the results of electronic surveillance had been used to gain information on which the questions put to the grand jury witness were based. 515 F. 2d at 159. See also *In re Buscaglia, supra,* 518 F.2d at 79.

These factors, applicable in the context of challenges to questions put to grand jury witnesses, are not necessarily of equal force in the context of a criminal prosecution, *Cf. United States v. Persico,* 491 F.2d 1156 (2d Cir. 1974). Of course there is an important interest in prompt trials, but not at the expense of determining whether a defendant's rights have been violated. The governmental interest in promptly obtaining an indictment to initiate a prosecution, when violators may be at large, is greater than the interest in promptly concluding a prosecution of defendants in custody or released on bail. It is also not entirely clear that those with responsibility for investigating and prosecuting a case can be as certain that no results of wiretapping have entered their files and led to evidence as those with the narrower responsibility of framing a set of questions to a particular grand jury witness. In instances where the grand jury investigation is far-reaching, however, this distinction may be marginal or entirely evanescent.

█ Though this motion arises in a context differing from cases involving

grand jury witnesses, I am not persuaded that § 3504 requires a broader search of government agencies than has occurred here. In the first place, the statute does not contemplate a generalized inquiry by every criminal defendant as to whether there has been wiretapping. It gives the right to demand a response only to those who present a claim that *evidence* is inadmissible. See *Lennon v. United States,* 387 F.Supp. 561 (S.D.N.Y. 1975). While it is helpful for defense counsel to make their claims ahead of, rather than during, a trial, we must not lose sight of the fact that the statute accords a right to those who have a complaint about some specific item of evidence. These defendants have made no complaint about any evidence. Moreover, in giving the right to demand a response to those challenging specific evidence, a claim normally made during the trial, the Congress would seem to have contemplated situations warranting at least as much speed as is appropriate to grand jury inquiries. Prompt, if somewhat limited, responses should therefore be sufficient.

Secondly, there are no intimations in the recent Court of Appeals' opinions in *Grusse* and *Buscaglia* that the affidavits there found adequate would not suffice in a criminal prosecution.

█ Finally, there is considerable merit in the view of the Ninth Circuit, expressed in only a slightly different context, that "a general claim [of wiretapping] requires only a response appropriate to such a claim." *United States v. See,* 505 F.2d 845, 856 (9th Cir. 1974). Unlike the respondents in *Grusse,* these defendants have alleged no facts whatever to support a belief that wiretapping has occurred. Obviously care must be taken lest too rigorous a test be constructed for assessing the scope of response required by a defendant's claim. The development of increasingly sophisticated techniques of electronic surveillance will lessen the likelihood that beeps, clicks, or other strange sounds will alert a telephone user to the possibility of a tap. If strange noises provided the only basis for a government response of broad scope, a premium would be placed upon undetectable surveillance. However, § 3504 points toward a quite different basis for claiming the possibility of wiretapping——the likelihood that a particular item of evidence, by its nature, probably resulted from electronic surveillance. An adequately supported claim of this sort, at least raising a suspicion that the evidence came from wiretapping, may well require the government to "affirm or deny" on the basis of a comprehensive inquiry of agencies with surveillance capability. An adequate claim that an individual has been the subject of governmental curiosity may suffice to require an inquiry of agencies with intelligence gathering responsibilities. However, a naked allegation that wiretapping has occurred may be sufficient to trigger § 3504's obligation to make some response, but not necessarily an obligation to check the files of government agencies having no apparent connection with a case. To such a claim, the sworn denial by the prosecutor and the investigating agencies should suffice. These agencies, however, should indicate whether reports from any other agencies have been used in the investigation, in which event a response from such other agencies would seem necessary. In this case, the averment in the affidavits that all of the evidence developed in the investigation came from "direct" sources seems sufficient to preclude the risk that reliance was placed on reports of other agencies that may in turn have been developed from electronic surveillance.

I have previously expressed some wonderment as to why the government does not have a central computerized or manual indexing system that would permit it promptly to make a government-wide response to an inquiry about wiretapping, See *In re Turgeon,* 402 F.Supp. 1239 (D. Conn.1975). But in the absence of a more precise requirement expressed in § 3504, or Fed.R.Crim.P. 16, or the decisions of the Second Circuit, I conclude,

with some reluctance, that the scope of the inquiry reflected in the affidavits submitted in this case is sufficient.

Accordingly, the motions to disclose are granted, the government's response is deemed sufficient compliance, and the motions to suppress are denied, no indication of wiretapping having been disclosed. Defendants may elicit a more comprehensive governmental response if any objection to evidence presents a reasonable basis for suspicion that the evidence has been obtained by wiretapping.

## II

Defendant Moeller has moved to suppress the testimony he gave in response to questions by Protection Mutual Insurance Co. This motion presents the question of whether a statement furnished by an officer of a corporate insured during an examination by the insurer has been compelled in violation of the constitutional protection against self-incrimination by reason of the fact that the examination was conducted pursuant to provisions of a fire insurance policy that are specified by state statute.

Conn.Gen.Stat. § 38–98 sets forth the so-called 165-line standard form of fire insurance policy that is required for use in Connecticut. See Conn.Gen.Stat. § 38–99. One provision specifies that no action for the recovery of any claim shall be sustainable "unless all the requirements of this policy shall have been complied with," and one of those requirements is: "The insured . . . shall . . . submit to examinations under oath by any person named" by the insurer.

Protection Mutual Insurance Co. issued a fire insurance policy containing the terms specified in Conn.Gen.Stat. § 38–98 to Grand Sheet Metal Products Co., insuring premises in Shelton, Connecticut, known as "Plant No. 4" of the

Sponge Rubber Products Co., a division of Grand Sheet Metal. On March 1, 1975, the Sponge Rubber plant was destroyed by fire. In April, 1975, the corporate insured filed a claim of loss for an amount in excess of the $51,578,000 face amount of the policy.

On April 23, 1975, the federal grand jury in this district returned an indictment, charging Charles Moeller and others with various violations of federal law arising out of the destruction of the Sponge Rubber plant. Moeller is the majority stockholder of Ohio Decorative Products Co., which wholly owns Grand Sheet Metal. After the indictment the insurer requested of the insured that Moeller be produced for examination under oath. Confronted with what he alleged to be a choice between answering the insurer's questions and thereby subjecting himself to the risk of self-incrimination or invoking his privilege against self-incrimination and thereby subjecting his company to the risk of loss of its claim for insurance, Moeller filed a civil action, seeking a declaration concerning his right to invoke his privilege against self-incrimination.[1] This Court dismissed that suit, without adjudication of the merits, finding that Moeller was not entitled to a declaratory judgment. *Moeller v. Protection Mutual Insurance Co.*, Civil No. N–75–153 (D. Conn. June 23, 1975). See *Hudson Tire Mart, Inc. v. Aetna Casualty & Surety Co.*, 519 F.2d 671 (2d Cir. 1975).

Thereafter Moeller submitted to examination by the insurer. Now, in the context of the criminal case, he moves to suppress that sworn testimony.

The government interposes a threshold objection that the motion is premature. It asserts a right to obtain the statement from the insurer even if Moeller should ultimately prevail in his contention that his testimony was com-

1. In the civil action Moeller sought a declaration (1) that he could invoke the protections of the Fifth Amendment, (2) that the filing of his civil suit seeking a declaration of rights was not a breach of the policy either by Moeller or by the corporate insured, and (3) that invoking his privilege against self-incrimination was not a breach of the policy, provided he testified fully before bringing suit on the policy.

pelled by state action to an extent sufficient to trigger Fifth Amendment protection. In that event, the government seems to concede, Moeller would be entitled to immunity against use of his testimony by the federal government, see *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); see also *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and the government would then have to bear the burden of demonstrating that any evidence alleged to have been derived from the statement was actually derived from independent sources, see *Kastigar v. United States,* 406 U.S. 441, 460–62, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). But, as the government contends, it could still use the testimony to pursue the investigation and perhaps prosecute other still unknown perpetrators of the crimes alleged. It could also, despite whatever Fifth Amendment protection Moeller can assert, use the testimony against Moeller's co-defendants, perhaps not by offering it in evidence, but surely by using it as an aid to further investigation of the charges against them and as a resource for effective cross-examination of them.

■ At the moment the government has not yet obtained the testimony, though it has issued a subpoena *duces tecum* to the insurer to obtain it.[2] Even if the government can demonstrate a clear right to obtain the testimony, Moeller is entitled now to an adjudication of whether the testimony can be used against him in the pending criminal case. The government has acted to obtain the testimony, and no useful purpose would be served by postponing decision until the document is physically in its hands. Indeed, it is in the government's interest to have the issue decided now, since a ruling in Moeller's favor would give the government the option of not acquiring the testimony until after Moeller's trial, thereby providing insulation against a claim that government evidence has been derived from the testimony.

Turning to the merits, the Court must decide whether the statute requiring the standard form fire insurance policy constitutes state compulsion of Moeller's testimony within the purview of the Fifth Amendment. Moeller asserts that by mandating the provisions of the insurance policy the state has compelled the questioning and that the loss of coverage for refusing to answer is an economic consequence of sufficient gravity to warrant constitutional protection.[3] See *United States ex rel. Sanney v. Montanye,* 500 F.2d 411, 414–15 (2d Cir. 1974). The government contends that Moeller testified voluntarily and that the pressure to answer, if any, was exerted by the insurer, not by the state.[4]

2. Apparently the government intends to obtain the testimony through the use of a grand jury subpoena, a course that would be questionable if the grand jury were being improperly used to prepare a pending case for trial. *See United States v. Fisher,* 455 F.2d 1101, 1104–05 (2d Cir. 1972); *United States v. Pack,* 150 F.Supp. 262, 264 (D. Del.1957). Perhaps the prospect of apprehending as yet unidentified perpetrators of the alleged crimes can justify the subpoena. Or the insurer, knowing it can be compelled by subpoena to produce the testimony at trial, may simply surrender it to the government in advance of trial. Though alerted to the existence of the grand jury subpoena, Moeller has made no objection other than the Fifth Amendment claim.

3. It is not at all apparent that defendant Moeller might have suffered the personal economic loss necessary to trigger the protection of the Fifth Amendment had he chosen not to give his statement to Protection Mutual. If Moeller's non-cooperation had forfeited the policy, the loser of the insurance proceeds would have been the corporate insured, Grand Sheet Metal, and not Moeller. Doubtless such a loss would have reduced the value of Moeller's shares in the parent company, but it is not so clear that a person electing to do business through a corporate form can assert his corporation's loss as the economic consequence that entitles him to Fifth Amendment protection. *Cf. United States v. Rosenstein,* 474 F.2d 705, 715 (2d Cir. 1973).

4. There is some plausibility to the government's contention that Moeller's testimony was not compelled by anyone, *i. e.,* that he gave it voluntarily. Clearly he was not un-

Neither side (nor the insurer in the prior declaratory judgment action) has cited any case where the issue has arisen in the context of a criminal prosecution. Prior decisions have indicated that the privilege is unavailable, though they have involved suits by an insured seeking to collect benefits despite assertion of the privilege as justification for not submitting to examination. See *Hickman v. London Assurance Corp.,* 184 Cal. 524, 195 P. 45 (1920); *Gross v. United States Fire Insurance Co.,* 71 Misc.2d 815, 337 N.Y.S.2d 221 (1972); *Restina v. Aetna Casualty & Surety Co.,* 61 Misc.2d 574, 306 N.Y.S.2d 219 (1969); *Kisting v. Westchester Fire Insurance Co.,* 290 F.Supp. 141 (W.D.Wis. 1968). Though these decisions do imply that statutory mandating of the examination provisions does not make the testimony state compelled,[5] they hold only that the insured cannot use the privilege as a sword to obtain benefits, whereas this defendant seeks to use it only as a shield to guard against incrimination. In *Hudson Tire Mart Inc. v. Aetna Casualty & Surety Co., supra,* the district court thought the presence of state action in similar circumstances was "very doubtful," but the Second Circuit, in sustaining the denial of an injunction to bar the examination, assumed for purposes of that appeal that

there was state action, 518 F.2d at 673, thus leaving the question unresolved.

■ Even if Moeller's testimony can be considered compelled or involuntary in the constitutional sense,[6] I am persuaded that the state has not been involved in either compelling the questioning or imposing the economic consequences for refusal to answer to a sufficient extent to invoke Fifth Amendment protection. There is no basis for concluding that Connecticut has enacted § 38–98 to assist law enforcement authorities in the investigation of arson. Long before the statute was enacted, insurance companies were entitled to condition payment of benefits upon an insured's submitting to examination under oath. The insurers needed no legislation to continue to assert that prerogative. The evident purpose of the legislature, in enacting the 165-line standard policy previously promulgated in New York, 27 McKinney's Consolidated Laws of N.Y.Ann. § 168, was simply to insure uniformity among the various insurance policies issued in the state.

A purpose of achieving uniformity does not end the inquiry, however, since the enactment of some provisions, even for a non-coercive purpose, might nevertheless sufficiently involve state power in the compulsion of testimony to invoke Fifth Amendment protection. But §

---

der any order to testify. No suit was brought by either the insurer or the corporate insured to compel his testimony.

Secondly Moeller may have had the option of refusing to be examined until after the criminal trial and then submitting to examination afterwards within the one-year period from date of loss within which suit on the policy must be brought. In *Hickman v. London Assurance Corp.,* 184 Cal. 524, 195 P. 45 (1920), the Court noted this possibility and indicated that the insurer's rejection of an insured's offer to be examined after the criminal trial may remove any prior default.

5. In all four cases the courts explicitly acknowledged that the examination provisions were part of a standard form policy mandated by state statute. *Hickman v. London Assurance Corp., supra,* 184 Cal. at 525, 195 P. 45; *Gross v. United States Fire Insurance Co., supra,* 71 Misc.2d 815, 337 N.Y.S.

2d at 222; *Retsina v. Aetna Casualty & Surety Co., supra,* 61 Misc.2d 574, 306 N.Y. S.2d at 220; *Kisting v. Westchester Fire Insurance Co., supra,* 290 F.Supp. at 145. However, none of these decisions explicitly discussed whether the legislation implicated the self-incrimination privilege. Moeller contends that the force of *Hickman* and the New York decisions following it has been eroded by the subsequent ruling that the Fifth Amendment is applicable to the states. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). However, *Hickman* did explicitly reckon with the self-incrimination clause of the California constitution.

6. The distinction is discussed in *Garrity v. New Jersey, supra,* 385 U.S. at 501, 87 S.Ct. 616 (Harlan, J., dissenting); *see also United States v. Solomon,* 509 F.2d 863 (2d Cir. 1975).

38–98 does not have that effect. The statute does not require the insurer to conduct any examination at all. Whether an examination occurs is entirely up to the insurance company. Nor does the statute, of its own force, require Moeller to answer any questions. If he refuses to testify, the state has no power to compel answers, as in *Garrity v. New Jersey, supra,* nor does it have the power to impose adverse consequences, as in *Lefkowitz v. Turley,* 414 U.S. 70, 94 S. Ct. 316, 38 L.Ed.2d 274 (1973). In the event of a refusal to be examined, the insurance company, not the state, makes a determination whether to assert that the condition of cooperation has been breached.

At most the state has by statute authorized a private entity to do exactly what it was entitled to do in the absence of legislation. *Cf. Otten v. Baltimore & O. R. Co.,* 205 F.2d 58 (2d Cir. 1953); see generally "Constitutionality of Permissive Legislation," 65 Yale L.J. 724, 728–29 nn. 25, 29, 30 (1956). It is true that the statute *requires* the insurer to adopt the standard form policy, but the provisions of that policy *authorize* and do not require the insurer to examine the insured. In some contexts state authorization may be considered a sufficient encouragement to invoke constitutional limitations. *Cf. Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed. 2d 830 (1967). If what is encouraged is racial discrimination, state action may well be found, especially in this Circuit where the threshold for state action is apparently lowered in the racial context. See *Weise v. Syracuse University,* 522 F.2d 397 (2d Cir. 1975); *Jackson v. Statler Foundation,* 496 F.2d 623 (2d Cir. 1974).

In the context of this case, however, the state purpose of achieving uniformity in insurance policy provisions is sufficiently removed from any implied purpose of aiding criminal investigations that it would be improper to consider statutory authorization for questioning to be the kind of encouragement that invokes constitutional limitations. The case would be quite different if the statute required that upon every presentation of a claim of loss, the insurer must question the insured, and that upon the insured's refusal to answer any question, the insurer must refuse to pay benefits. Even in the interest of uniformity, the state could not require questioning and require adverse consequences for refusal to answer without invoking Fifth Amendment protections. This statute stops well short of that compulsion. The insurer is not acting as agent of the state. Compare *United States ex rel. Sanney v. Montanye, supra,* with *United States v. Solomon, supra.*

The motion to suppress is denied.

### III

Several defendants have moved to dismiss Count 8 of the indictment on various grounds, including contentions that the statute involved is void for vagueness, that Count 8 is duplicative of other counts in the indictment, and that Count 8 fails to charge an offense. Only the last ground will be considered, since the Court finds it is a sufficient basis for dismissing Count 8. Fed.R.Crim.P. 12 (b)(2).

Count 8 charges a violation of 18 U. S.C. § 1962(c), a provision added to the Criminal Code by Title IX of the Organized Crime Control Act of 1970. 84 Stat. 942. The statute provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Two related provisions, § 1962(a) and (b), proscribe investing funds from a pattern of racketeering activity in an enterprise affecting commerce and acquiring an interest in such an enterprise by a pattern of racketeering activity.

Title 18 U.S.C. § 1961 contains three definitions necessary to an understand-

ing of the scope of § 1962(c). " 'Racketeering activity' means (A) any act or threat involving . . . kidnaping . . . arson . . . which is chargeable under state law and punishable by imprisonment for more than one year"; " 'enterprise' includes any . . . group of individuals associated in fact although not a legal entity"; " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." § 1961(1), (4), (5).

Count 8 charges as follows:

From December, 1974, the precise date to the Grand Jury being unknown, and continuously thereafter up to and including the date of the filing of this indictment, in the District of Connecticut and elsewhere, CHARLES D. MOELLER, DAVID N. BUBAR, PETER BETRES, RONALD D. BETRES, ALBERT R. COFFEY, ANTHONY A. JUST, DENNIS C. TICHE, MICHAEL J. TICHE, JOHN W. SHAW, and DONALD L. CONNORS, constituting and being associated with an enterprise engaged in, and the activities of which affected interstate commerce as defined by Title 18, United States Code, Section 1961(4), to wit: a group of individuals associated in fact for the purpose of burning and destroying buildings, did unlawfully, wilfully and knowingly conduct and participate in the affairs of such enterprise through a pattern of racketeering activity as defined by Title 18, United States Code, Section 1961, to wit: arson, in violation of Connecticut General Statutes (Rev. 1958 as Amended), Section 53a–113, and kidnapping in violation of Connecticut General Statutes (Rev.1958 as Amended) Section 53a–92,

In violation of Title 18, United States Code, Section 1962(c) and 2.

As the overall indictment makes clear, the arson referred to in Count 8 is the burning of Plant 4 of the Sponge Rubber Products Company at Shelton, Connecticut. In a bill of particulars, item F. 3.a., the government has somewhat refined Count 8 by stating: "No buildings other than Plant 4, Sponge Rubber Products Company, Shelton, Connecticut, are alleged to have been burned or destroyed." At oral argument the government has made clear that this response is to be understood as specifying both that Plant 4 is the only building destroyed and that it is the only building that the alleged enterprise had a purpose to destroy. The indictment also alleges that the victims of the kidnapping alleged in Count 8 were three employees of the Shelton plant, see Count 1, overt act q., and that the kidnapping and the arson both occurred on March 1, 1975. Thus, the essential structure of Count 8 is the allegation that the defendents formed an enterprise to burn the Shelton plant, and that they conducted the affairs of that enterprise by committing two acts, burning the plant and kidnapping three employees of the plant.

Three issues arise in considering whether Count 8 states an offense. The first is whether the statutory requirement of a "pattern of racketeering activity" is adequately alleged by an allegation of two acts that occurred in the course of a single criminal episode.

Were the question open, I would have seriously doubted whether the word "pattern" as used in § 1962(c) should be construed to mean two acts occurring at the same place on the same day in the course of the same criminal episode. While the statutory definition makes clear that a pattern can consist of only two acts, I would have thought the common sense interpretation of the word "pattern" implies acts occurring in *different criminal episodes*, episodes that are at least somewhat separated in time and place yet still sufficiently related by purpose to demonstrate a continuity of activity. I would further have thought that the normal canon of narrowly

construing penal statutes points toward such an interpretation. Finally, I would have thought the legislative history made such an interpretation clear. Thus, the Senate Report explains:

> The concept of 'pattern' is essential to the operation of the statute . . . The target of Title IX is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of *continuing* activity to be effective. It is this factor of *continuity* plus relationship which combines to produce a pattern. S. Rep. 91–617, 91st Cong., 1st Sess. 158. (Emphasis added).

■ However, the issue has been authoritatively resolved in this Circuit by *United States v. Parness*, 503 F.2d 430 (2d Cir. 1974), *cert denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). In that case the pattern of racketeering activity by which the takeover of a hotel was accomplished consisted of three acts: two acts of interstate transportation of stolen property and one act of causing a person to travel in interstate commerce in furtherance of a scheme to defraud. The two acts of interstate transportation of stolen property occurred on February 4 and February 9, 1971, only five days apart, and were intimately related; the first involved the transportation of $155,000 in cashier's checks to repay a loan, and the second involved the transportation of $5,000 to pay the lender's attorney. More significantly, the interstate travel activity consisted of causing a person to travel to a bank on February 4 to pick up the cashier's checks. Any two of these three acts was held to constitute the requisite pattern of racketeering activity. 503 F.2d at 438. A "pattern" can apparently be established in this Circuit by two acts occurring on the same day in the same place and forming part of the same criminal episode.[7]

The second issue arising under Count 8 is whether the alleged enterprise whose affairs the defendants are accused of conducting through a pattern of racketeering activity is the type of enterprise that is within the scope of § 1962(c). The indictment alleges that the enterprise is "a group of individuals associated in fact for the purpose of burning and destroying buildings." Plainly an enterprise of this sort is not a legitimate business, and the question arises whether or not the enterprises covered by the statute are limited to legitimate businesses.

The statutory definition of "enterprise" contains no words of limitation concerning the lawfulness of activities. § 1961(4). The legislative history, however, provides the clearest indication that Congress intended "enterprise" to mean legitimate businesses. The Senate Report states that Title IX "has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S.Rep. 91–617, 91st Cong., 1st Sess. (1969) (hereafter "Report"). The section-by-section analysis states that "Section 1962 establishes a threefold prohibition aimed at the infiltration of legitimate organizations."[8]

---

7. It is arguable that *Parness* is distinguishable from the present case. In *Parness* the acts held to constitute the pattern of racketeering activity and the context in which they occurred supported an inference that they were part of a pattern of continuing activity even though the acts were closely related in time. The crime charged in *Parness* was itself an activity of a continuing nature, an elaborate scheme to accomplish the takeover of a hotel. By contrast, the crime charged in Count 8 appears to be a discrete criminal venture, the arson of a building, even though some preparatory steps were undoubtedly necessary. However, there is no indication in *Parness* that the Court of Appeals requires anything more for the establishment of a "pattern" within the meaning of § 1961(5) than two acts of racketeering, regardless of whether their occurrence implies continuing activity.

8. Nor is there one word in the House floor debates over the Organized Crime Control Act that would indicate that any member of Congress thought Title IX would reach any-

*Id.* at 159. The Report's discussion of Title IX repeatedly refers to "legitimate" organizations as the ones to be protected, lists a number of illustrations, and at no point remotely suggests that Title IX is intended to penalize investing in, acquiring, or conducting the affairs of unlawful enterprises. *Id.* at 76–83. The congressional intent is also evidenced by a comment concerning the civil remedies of Title IX, which complement the criminal sanctions. These civil remedies, says the Report, are "broad remedial provisions for reform of corrupted organizations." *Id.* at 160. That comment can have reference only to a legitimate business corrupted by racketeering money or activity.

 Whatever doubt may exist as to whether "enterprise" should be construed to include unlawful organizations in addition to legitimate businesses must be resolved against such a broad construction for two reasons. First is the traditional canon of resolving ambiguities in criminal statutes in favor of lenity. See *Rewis v. United States*, 401 U. S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971); *Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955). More pertinent is the concern, grounded in principles of federalism, not to give federal criminal laws a broad construction that "would alter sensitive federal-state relationships" or "transform relatively minor state offenses into federal felonies." *Rewis v. United States, supra,* 401 U.S. at 812, 91 S.Ct. at 1059; *United States v. Five Gambling Devices,* 346 U.S. 441, 74 S.Ct. 190, 98 L.Ed. 179 (1953). If "enterprise" in § 1962(c) includes unlawful ventures, then the statute could be used to prosecute any unlawful activity that affected interstate commerce so long as the participants in the activity committed any two acts within the broad definition of racketeering activity. Congress may have power to extend federal criminal jurisdiction that far into areas normally handled by the states, but it should take a clear indication of legislative intention before such a sweeping purpose is attributed to it.

The hazards of such a broad interpretation are highlighted by comparing its consequences with Title VIII of the Act. In that title, Congress extended federal criminal authority into the area of gambling, but did so under strict limitations. The illegal gambling businesses proscribed by Title VIII are only those that involve five or more persons and remain in substantially continuous operation for more than thirty days or have a gross revenue of $2,000 in a single day. 18 U.S.C. § 1955(a). If § 1962(c) were interpreted to include unlawful activities, the limitations of § 1955 could be easily circumvented. A federal prosecution could be brought against any gambling enterprise with any effect on interstate commerce whenever the operators committed two acts in violation of any state gambling statutes. Congress could not have enacted minimum criteria in Title VIII for number of participants and scope of the gambling activity and then

---

thing but legitimate business. Representative Poff, the floor manager for the bill, stated:

> [P]erhaps the single most alarming aspect of the organized crime problem in the United States in recent years has been the growing infestation of racketeers into *legitimate business enterprises.* . . . Title IX of S. 30 provides the machinery whereby the infiltration of racketeers into *legitimate businesses* can be stopped and the process reversed when such infiltration does occur. 116 Cong.Rec. 35,295 (Oct. 7, 1970) (Emphasis added).

At least six other congressmen expressed the opinion that Title IX was intended to prevent the infiltration of legitimate businesses, and none ever discussed the statute in terms that might be thought to have contemplated the government's use of § 1962 in the present case. 116 Cong.Rec. 35,196 (remarks of Rep. Celler); *id.* at 35,200 (remarks of Rep. St. Germain); *id.* at 35,201 (remarks of Rep. McCulloch); *id.* at 35,206 (remarks of Rep. Kleppe); *id.* at 35,304 (remarks of Rep. Railsback); *id.* at 35,319 (remarks of Rep. Anderson); *id.* at 35,193 (remarks of Rep. Poff).

intended Title IX to be used to prosecute gambling activities that fall short of these criteria.

All of this would seem beyond argument were it not for the holding of the Seventh Circuit that § 1962 is not limited to legitimate enterprises. *United States v. Cappetto*, 502 F.2d 1351 (7th Cir. 1974). With deference I am unable to accept that decision. An essential part of the argument in *Cappetto* is that the Senate Report on Title IX demonstrates Congress' intention to include illegal gambling businesses within the category of enterprises covered by § 1962. For this proposition the opinion quotes from pages 72 and 73 of the Report, 502 F.2d at 1358. But the quoted excerpt concerns Title VIII, dealing with proscribed gambling businesses, and not Title IX, dealing with enterprises to be protected from racketeering influences. That excerpt and Title VIII itself demonstrate that when Congress wanted to proscribe an illegitimate enterprise, it knew precisely how to do it.

*Cappetto* also drew some support from the Second Circuit's refusal to give the word "enterprise" a narrow reading in *Parness*. But that view was expressed in rejecting appellant's contention that "enterprise" included only domestic businesses, the Court holding that a foreign business was also protected from racketeering influences so long as it was a business affecting United States commerce. That decision had no occasion to consider expanding the coverage of "enterprise" to include unlawful activities, with all of the implications of such an interpretation for extending federal authority and undermining the precise limitations of Title VIII.

I conclude that "enterprise" in § 1962 means what the Senate Report says—le-

gitimate activity. Plainly a group of individuals associated "for the purpose of burning and destroying buildings" is not the type of legitimate business that Congress was seeking to protect from racketeering influences.

█ A third issue that arises under Count 8 is whether, even if "enterprise" could be interpreted to include an unlawful venture, it should be interpreted to cover a venture designed to accomplish one specific criminal episode, or whether "enterprise" connotes a requirement of some continuing activity. Since the legislative history refers only to legitimate businesses, it is not surprising that it furnishes no guidance as to whether illegitimate ventures must be of a continuing nature. But the entire purpose of Title IX indicates that a venture formed to commit one criminal episode could not have been within Congressional intendment, even if that episode were carried out by a "pattern" consisting of two acts. Title IX was intended to safeguard a continuing enterprise from the influences of racketeering. If "enterprise" in § 1962 means not only an unlawful venture but also one established to accomplish a single criminal episode, the extraordinary extension of federal criminal authority that ensues from including unlawful ventures becomes even greater.[9] At least *Cappetto*, in extending "enterprise" to unlawful ventures, did so only in the context of an activity that was plainly of a continuing nature.

As previously explained, the government has narrowed the allegation of Count 8 to allege an enterprise concerned solely with the burning of Plant 4 at Shelton.[10] A venture to burn a single building is not an "enterprise" proscribed by § 1962; it is quite simply an arson punishable by state law.

---

9. In the floor debate on Title IX, Congressman Poff stated that "The *proposed statute is not aimed at the isolated offender. . . .*" 116 Cong.Rec. 35,193 (Oct. 6, 1970).

10. It is not entirely clear whether the government's narrowing of its claim in this re-

gard indicates that Count 8 fails to allege an offense justifying dismissal, or that there is an insufficiency of proof, warranting a directed judgment of acquittal. *See United States v. Sisson*, 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970).

Primarily because § 1962 does not include unlawful ventures among the "enterprises" to be safeguarded from racketeering influences, and also because "enterprise" does not include a group associated to commit a single criminal episode, Count 8 does not allege an offense under federal law and is therefore dismissed.

Other motions have been ruled on in a memorandum made available to counsel.