Arthur John THOMPSON, et al., Plaintiffs,

v.

WYOMING ALASKA, INC., et al., Defendants.

Richard F. NORD, Wyoming Alaska Leasing, Inc., Reuel T. Call and Bonnie Blunk, Third Party Plaintiffs,

v.

Jay MANNING, Mark Deitlien, and Craig Raines, Third Party Defendants.

Civ. No. NC83–0017G.

United States District Court, D. Utah, C.D.

Jan. 27, 1987.

Lorin N. Pace, Salt Lake City, Utah, for plaintiff.

Ronald C. Barker, Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter came on regularly for hearing on October 6, 1986, on defendants' Wyoming Alaska Leasing, Inc., Reuel T. Call, and Bonnie A. Blunk, motion for summary judgment with regard to plaintiffs' Sixteenth and Seventeenth Claims for Relief. Plaintiffs were represented by Lorin N. Pace and Eric W. Bjorklund and defendants were represented by Ronald C. Barker. Plaintiffs and defendants submitted memorandums of law and the court heard oral argument, after which the matter was taken under advisement. The court now

being fully advised, sets forth its Memorandum Decision and Order.

## BACKGROUND

This action arises generally from the franchising of Trailside General Stores ("Trailside"). Trailside is the trade name for a chain of convenience stores which specialize in selling grocery items and gasoline. Defendant Wyoming Alaska Leasing, Inc. ("WACO") is the owner of the general franchise rights to Trailside. Plaintiffs in this action allege that defendants Reuel T. Call ("Call"), president of WACO, and Bonnie A. Blunk ("Blunk"), an officer and director, determined that WACO should expand the franchising of Trailside stores, which resulted in an agreement between WACO and defendant Richard F. Nord ("Nord") in which Nord was engaged to act as WACO's exclusive agent for such a franchise marketing program. As part of that agreement Nord was to consult with WACO in creating a "franchise package" to be sold to franchisees. The agreement also provided that WACO and Nord would split evenly the consideration received from the sale of any "Master [Area] Franchise Agreement," and that Nord was further entitled to receive a percentage of the royalty fees paid to WACO by franchisees. Nord operated and conducted his activities by and through "Saddle Corporation," which in fact was not incorporated and was an alleged instrumentality of Nord.

WACO commenced doing business approximately ten years ago and has been in business continuously thereafter. The acts complained of here occurred during the period June 13, 1981 to October 15, 1981. During that period, defendant WACO entered into four separate Area Franchise Agreements with the plaintiffs. The terms of those agreements were essentially the same except that different territories were covered by each agreement. Plaintiffs Vernon J. Manning and Robert R. Manning by and through his father and guardian Luther R. Manning (collectively "Mannings"), plaintiffs Wilma B. Muth and Carl R. Muth (collectively "Muths"), plaintiffs Russell Haga, Denise Haga and Ermalee Atkinson (collectively "Hagas"), and plaintiff Arthur Thomas Thompson ("Thompson") obtained separate exclusive franchise rights covering the states of Utah, Oregon, New Mexico and Nevada, respectively. According to the terms of the agreements the plaintiffs were granted the exclusive right to operate or subfranchise Trailside stores within their respective exclusive territories. On the same day that the Mannings, Hagas and Thompson executed their respective agreements with WACO, each of those parties also entered into apparently separate marketing services contracts with Nord acting through the Saddle Corporation. The Muths also entered into a marketing services contract with the Saddle Corporation sixteen days after contracting with WACO for exclusive franchise rights. According to the terms of the marketing services agreements, the Saddle Corporation (Nord) was obligated to utilize best efforts to market the respective franchise rights of the plaintiffs to potential subfranchises within each particular territory, and was entitled to receive a commission for such services.

Plaintiffs claim that WACO made false representations and material omissions in negotiations for and consummation of each respective Area Franchise Agreement. Plaintiffs allege that Nord, acting through the unincorporated and unregistered entity known as the Saddle Corporation, induced plaintiffs to enter into their respective marketing services contracts by making fraudulent statements and by failing to state material facts. Plaintiffs tie the alleged misrepresentations by WACO and Nord together by contending that WACO, through its principals Call and Blunk, conspired with Nord to devise a scheme and artifice to defraud comprised of the overall plan to market Trailside franchises.

## LEGAL ANALYSIS

Defendants have filed a number of previous motions relating to the various legal theories upon which plaintiffs seek recov-

ery. The motion for summary judgment presently before this court relates only to plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982) and under the Utah Racketeering Influences and Criminal Enterprise Act ("RICE"), Utah Code Ann. §§ 76–10–1601 to –1608 (Supp.1986). Defendants argue that plaintiffs' RICO and RICE claims must be dismissed on several grounds,[1] but this court has determined that defendants' contention with regard to lack of a pattern of racketeering activity is dispositive.

## I. *"Pattern of Racketeering Activity"*

■ "Pattern" is not defined in the RICO statute.[2] However, by way of limitation and not definition, the statute does provide that " 'pattern of racketeering activity' *requires at least two acts* of racketeering *activity....* " 18 U.S.C.A. § 1961(5) (emphasis added). "Racketeering activity" under the RICO statute "means" any act involving specified crimes under state law or any act "indictable" under specified federal criminal statutes, or other specified federal offenses. 18 U.S.C.A. § 1961(1). The dictionary definition of "pattern" as relates to behavior is "a reliable sample of traits, acts, tendencies, or other observable characteristics...." *Webster's Ninth New Collegiate Dictionary* (1985). Under the Civil Rights Act, "pattern or practice" means "an intentional, regular, or repeated violation of the right granted by the Act." See *United States v. Hunter*, 459 F.2d 205, 217 (4th Cir.1972). Manifestly, the plain meaning of

1. Defendants allege: (1) Plaintiffs' pleading lacks required specificity with regard to essential facts and generally fails to comply with Rule 9(b) of the Fed.R.Civ.P.; (2) Plaintiffs lack standing to assert a RICO claim; (3) Plaintiffs have failed adequately to plead the enterprise and have failed to distinguish the enterprise from the persons seeking recovery; (4) Plaintiffs have failed to demonstrate any proximate causation between any alleged RICO violations and their injuries; (5) Plaintiffs have failed adequately to allege a pattern of racketeering activity.

2. "Pattern" is described in a later provision of same bill passed by Congress:

pattern contemplates a design or arrangement. The Supreme Court has recognized under RICO that two isolated acts do not constitute a "pattern of racketeering," and that the predicate acts must be *related* and also must denote a degree of *continuity*. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). "Pattern of racketeering activity," then, is a design or arrangement of predicate acts which manifests both relatedness and continuity. This court conceives this to mean that in addition to the presence of design or arrangement there must be a separation in time and place of acts related to each other and/or the affairs of the Enterprise, and an ongoing or repetitive characteristic of such acts. The number of acts under RICO required to establish a civil cause of action is not set forth in the statute, but there must be "at least two." In a proper case it may be possible to demonstrate design and arrangement plus relatedness and continuity with just two acts, but depending on the predicate offense involved often more than two and perhaps many "acts" may be necessary.

## II. *"Scheme"—"Episode"—"Transaction" Involving Mail/Wire Fraud*

Mail and/or wire fraud are crimes which by definition must be perpetrated pursuant to a scheme. In the typical civil RICO action involving mail or wire fraud there are often many acts associated with one "transaction," "episode" or "scheme." Very often only one discrete harm or injury

[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

18 U.S.C. § 3573(e) (dealing with increased sentences for dangerous special offenders). The Supreme Court in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985) cited the referenced statute and stated that such "language may be useful in interpreting other sections of the Act."

is perpetrated pursuant to one elongated transaction, or pursuant to an episode of acts within a scheme (such as a series of telephone calls or mailings), or pursuant to an overall continuing scheme. In *Grant v. Union Bank*, 629 F.Supp. 570 (D.Utah 1986) this court was confronted with two separate loan transactions, each of which involved several separate acts of mail and/or wire fraud. One of the loans allegedly tainted with mail/wire fraud was found as a matter of law under the pleadings not to rise to a criminal offense as required under RICO. It was apparent that the other loan, even though evidenced by several separate mailings and/or telephone calls, constituted only one unified loan transaction. This court held that the single transaction, while consisting of an episode of acts, was insufficient to demonstrate a "pattern of racketeering activity." *Id.* at 579. In *Huntsman-Christensen Corp. v. Mountain Fuel Supply Co.*, No. C–86–530 G, slip op. (D.Utah Nov. 24, 1986) this court adhered to the view that "in the case of multiple acts or mail and/or wire fraud, such must have been perpetrated within at least two separate schemes or episodes," but no attempt was made to define "pattern" or to distinguish between "episodes," "transactions" and "schemes." The court did acknowledge the requirements of relatedness and continuity, but found no "pattern of racketeering activity" under the facts of that case. This court concluded in *Huntsman* that plaintiffs had pleaded predicate racketeering acts which were connected with each other within one common scheme, but that in that situation of mail/wire fraud more than one continuing scheme or episode would be necessary in order to establish a sufficient and observa-

ble pattern. The acts in question did not establish the regular way in which defendants did business.

Other courts have recognized that RICO actions based upon predicate acts of mail or wire fraud are to be distinguished from other RICO actions because the concepts of transaction, episode, and scheme become confused and provide little guidance in determining continuity. For example, in *Louisiana Power & Light v. United Gas Pipe Line*, 642 F.Supp. 781, 809 (E.D.La.1986) the court noted that a single predicate act of mail or wire fraud may in some circumstances in itself constitute a scheme that causes independent harm, while in other circumstances multiple acts of mail or wire will result in only one harm.[3] In *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 325 (7th Cir.1986) (Cudahy, J., concurring) Judge Cudahy observed that a multiplicity of predicate acts of mail or wire fraud may be no indication of the requisite continuity of the underlying fraudulent activity. *See also Temporaries, Inc. v. Maryland National Bank*, 638 F.Supp. 118, 125 (D.Md. 1986) ("the phone calls and mailing made in furtherance of the scheme were essentially one set of negotiations and failed to add a continuous character to the scheme.")

## III. *"Scheme"—"Episode"—"Transaction" Versus Other Factors in Determining "Pattern"*

Some courts are now emphasizing the policy rationale behind the requirement of a "pattern of racketeering activity" rather than exclusively looking at whether the predicate acts occurred within one or more "episode," "transaction" or "scheme."[4]

---

**3.** The court said:

RICO is meant to punish those who harm others in a continuous systematic way, not those who harm others only once by a series of actions. When a plaintiff is hurt by one fraud which is only furthered by several mailings rather than hurt by repeated acts of fraud, the Courts are reluctant to impose RICO damages.... That is, a single fraud merely furthered by the mails would not be enough; but a fraudulent scheme committed by sending a series of materials that are them-

selves fraudulent, with each causing independent harm to the plaintiff, would be.
642 F.Supp. at 809.

**4.** It may be of some help in facilitating analysis of the public policy requirement of "pattern" to distinguish the concepts of "transaction," "episode," and "scheme." In *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir.1986) the court recognized the distinction between a "scheme" and an "episode." "An episode is apparently something more than an act of racketeering activity but something less than a scheme." In

For example, in *Papai v. Cremosnik*, 635 F.Supp. 1402, 1410 (N.D.Ill.1986) the court stated:

> The line between "scheme" and "episode" is not always a bright one.
>
> .    .    .    .    .
>
> Because both the scheme and the episode concept can easily slip into a "I know it when I see it" style of discourse, we are reluctant to follow either concept without exploring the public policy implicated by our choice.

In *Papai*, Judge Moran required that plaintiff's pleadings demonstrate multiple "episodes" of racketeering activity *plus* some other evidence which raises an inference that the episodes "were not an aberration in the way a defendant conducted his business. Rather, the pattern made up of multiple episodes must be a regular part of the way a defendant does business and in that sense, ongoing." *Id.* at 1412. In *Temporaries, Inc. v. Maryland National Bank*, 638 F.Supp. 118, 123 (D.Md.1986) the court said:

> A more flexible and accurate approach to identifying pattern may be to require

either 1) more than one scheme or 2) an open-ended continuous scheme which contains a multiplicity of predicate acts. The latter category can be further defined on a case by case basis, just as the definition of "scheme" will certainly require further development. This approach is most compatible with Congressional intent, and reconciles several other recent decisions defining the scope of pattern which are contrary to the "two scheme" requirement.

In determining the existence or nonexistence of "pattern," the Seventh Circuit has recently held that it will focus upon such factors as the *number and variety of predicate acts*, the *length of time* over which they were committed, the *number of victims*, the presence of *separate schemes* and the *occurrence of distinct injuries*, but will not require necessarily that there be two "schemes" so long as other factors are present which indicate that there is a threat that the defendants' actions will continue. *Morgan v. Waukegan*, 804 F.2d 970, 975–76 (7th Cir.1986).[5] This court is

---

*Professional Assets Management v. Penn Square Bank*, 616 F.Supp. 1418, 1421 (D.C.Okla.1985) Judge Alley held that the many acts which went into preparation of an audit report constituted a "single, unified transaction." A "transaction" is defined as involving an act or acts between two parties "that reciprocally affect or influence each other." *Webster's Ninth New Collegiate Dictionary* (1985). Although a fraudulent transaction may involve multiple acts it most often results in a single independent harm. An "episode" for RICO purposes is often referred to as "an illegal act or acts which occur within a tightly limited time and place." *See Papai v. Cremosnik*, 635 F.Supp. 1402, 1412 (N.D.Ill. 1986). One distinction between "episode" and "transaction" seems to be that a transaction may take place, although not necessarily, over a longer period of time than an episode. On the other hand, an episode may involve, although not necessarily, more than one independent harm, whereas a transaction usually will result in a single harm. A "scheme" is defined as a "plan or program of action" or "a systematic or organized framework." *Webster's Ninth New Collegiate Dictionary* (1985). Clearly a scheme may embrace multiple episodes or transactions. Consequently, a single scheme may take place over a long period of time and may result in multiple independent harms. Although the line between where one scheme ends and another

begins is fuzzy, factors to look at are whether the acts involved have the same or similar purpose, results, participants, victims, or methods of commission. In *Louisiana Power & Light v. United Gas Pipe Line*, 642 F.Supp. 781, 808 (E.D. La.1986) the court noted that three positions are presently taken as to what the continuity and relationship elements of the pattern requirement mean, i.e., "multiple illegal schemes," "two related predicate acts" and a "compromise position" consisting of "multiple criminal episodes evidencing an ongoing practice." In adopting the "multiple criminal episodes" approach, the court said:

> The exact meaning of the term "multiple criminal episodes" is not clear, but at a minimum it means that the defendant must harm the plaintiff more than once—it must have committed acts which are ongoing and which have an independent and repeated harmful significance for the plaintiff.
>
> ... Accordingly, I rule that a RICO plaintiff must show that the defendant's actions constituted related, multiple, and ongoing criminal episodes, each with an independent harmful effect to recover RICO damages.

**5.** The court said that in order to meet the test of continuity "the predicate acts must be ongoing over an identified-period of time so that they

persuaded that the factors just enumerated may all be very relevant in the determination of pattern in a given case. Mere definitional categories or counting of acts should not be determinative. The occurrence of multiple injuries and independent harms, as a result of a design and arrangement of acts by the RICO defendants, may be the most relevant inquiry.

### IV. Single Scheme—Factual Allegations of Pattern in this Case

In the case at bar plaintiffs have alleged violations of the antifraud provisions of the securities laws as well as acts of mail fraud and interstate transportation of money taken by fraud as predicate acts for the RICO and RICE violations. Plaintiffs argue that the sale of Area Franchise Rights by WACO to four separate plaintiffs, when combined with the sale of marketing services by Nord, dba Saddle Corporation, amounted in each case to the sale of an investment contract[6] pursuant to a single scheme. Plaintiffs then argue that under the facts of this case there should be no requirement of two separate schemes in order to demonstrate the existence of pat-

tern. Plaintiffs rely on cases similar to Morgan v. Waukegan which look at multiple factors rather than merely the number of schemes to demonstrate pattern. Plaintiffs contend this is not a case where the predicate acts are solely mail or wire fraud of the variety which result in only one harm since four separate plaintiffs were defrauded and injured, even though the wrongful acts were perpetrated pursuant to a single scheme.

Assuming the other requirements of pattern to be present this court recognizes that a civil RICO cause properly could be brought based upon predicate acts perpetrated pursuant to a single scheme involving separate independent harms, such as where multiple victims suffer discrete injuries.[7] In Torwest DBC, Inc. v. Dick, 810 F.2d 925 (10th Cir.1986), the Tenth Circuit stressed in a single scheme case that the "continuity" requirement of pattern requires demonstration of "facts from which at least a threat of ongoing illegal conduct may be inferred," and that the single scheme would have to involve "continuous behavior."[8] In this case pat-

---

can fairly be viewed as constituting separate transactions, i.e., 'transactions somewhat separated in time and place.'" Id. at 975 (quoting United States v. Moeller, 402 F.Supp. 49, 57–58 (D.Conn.1975)).

**6.** According to the Supreme Court in SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) an investment contract security is created if three elements are demonstrated: (1) there is an investment of money; (2) in a common enterprise; (3) with profits to come solely from the efforts of others. Id. at 301, 66 S.Ct. at 1104. Essential to plaintiffs' legal argument is a finding that the sale of area franchise rights by WACO was related to the sale of marketing services by Nord, dba Saddle Corporation. Otherwise, the sale of the franchise rights would not be in a common enterprise with profits to come from the efforts of others. In that regard, plaintiffs have alleged a conspiracy between WACO's directors Call and Blunk and defendant Nord to devise a scheme and artifice to defraud plaintiffs.

**7.** Professor Goldsmith has observed that in certain situations pattern could be established within a single scheme:

On occasion, however, multiple mailings (or wires) may properly constitute pattern. Sup-

pose, for example, that a would-be racketeer sends multiple mailings to a victim one day, and the next day sends another group of mailings to another victim. This type of fraud could become pervasive and damaging. Since, under such circumstances, the separate mailings to each victim could be considered as distinct criminal episodes (although arguably in furtherance of one scheme), the pattern requirement could still be satisfied.

Goldsmith & Keith, Civil Rico Abuse: The Allegations in Context, 1986 B.Y.U.L.REV. 55, 101 n. 192. In Heritage Ins. Co. v. First National Bank of Cicero, 629 F.Supp. 1412, 1416 (N.D.Ill.1986) the court emphasized multiple injuries rather than multiple victims, pointing out that repeated criminal acts may constitute a pattern notwithstanding the fact that the acts affect a single victim, involve the same or similar purpose and identical means are employed.

**8.** It may be inferred from Torwest that "a scheme that contemplated open-ended fraudulent activity over a period of time" would point to a different result than the scheme with which the court was confronted in that case. Torwest involved "numerous racketeering acts" but only "one victim," "one time," and "one discrete goal" thus constituting an "isolated incident." Id. at 929. The court noted that "[a] more difficult

tern fails because the acts complained of were not ongoing and could not be said to constitute the regular way in which defendants conduct business. Here the acts of alleged securities fraud occurred within an isolated period of four months. Plaintiffs recognize that WACO has operated Trailside convenience stores for approximately ten years and that WACO did not engage in any other separate schemes during any of the ten years it has been operating Trailside stores. There is no evidence that WACO engaged in conduct similar to that alleged except for the brief four month period. Although four independent harms were involved in this case, this court is unwilling to infer that WACO engaged in securities fraud as a regular part of the way it does business. The acts here were not sufficiently repetitive or ongoing to satisfy the requirements of continuity and to establish a "pattern of racketeering activity."

For the foregoing reasons, the RICO and RICE claims are dismissed. This Memorandum Decision and Order will suffice as the court's final action on this motion; no further Order need be prepared by counsel.

question is presented when the RICO claim is based on one scheme involving one victim, but the plan contemplates open-ended fraudulent activity and does not have a single goal that, when achieved, will bring the activity to an end." *Id.* at 929.