LOUISIANA POWER AND
LIGHT COMPANY

v.

UNITED GAS PIPE LINE COMPANY.

Civ. A. No. 84–5156.

United States District Court,
E.D. Louisiana.

Aug. 15, 1986.

Monroe & Lemann, Eugene G. Taggart, Kenneth P. Carter, Terrence G. O'Brien, New Orleans, La., for plaintiff.

Lemle, Kelleher, Kohlmeyer, Hunley, Moss & Frilot, C. Murphy Moss, Jr., New Orleans, La., Pierson, Semmes & Finley, Knox Bemis, Mark E. Greenwold, Paul Ryberg, Jr., Washington, D.C., for defendant.

## FINDINGS AND CONCLUSIONS

LIVAUDAIS, District Judge.

This diversity case is brought by the Louisiana Power and Light Company ("LP & L"), a local utility, against United Gas Pipe Line Company ("United"), a gas supplier whose principle place of business is Houston, Texas, for breach of contract and for alleged violations of the Racketeer Influenced and Corrupt Organizations· Act

("RICO"), 18 U.S.C. § 1961 et seq. It is the latest in a number of bitterly fought disputes between the parties, who have been litigating a number of matters for the better part of ten years.

The complaint in this case alleges that United violated the pricing provisions of a 1968 partial requirements contract between the parties. It alleges that United wrongly included certain costs in its price to LP & L, failed to credit LP & L with certain refunds properly, and failed to document adequately the charges it passed on to LP & L under the contract. The complaint also alleges that United wrongly priced deliveries made pursuant to a 1980 agreement to transfer volumes of gas originally allocated elsewhere to a local LP & L power plant. LP & L amended its complaint on November 25, 1985 to allege that the supposed contract violations of United were not the result of innocent mistakes, but rather, were intentional frauds committed by use of the mails and wire communication system, entitling it to the treble damages remedy provided by the RICO statute. 18 U.S.C. § 1964.

This matter was tried during the last two weeks in June. At trial, voluminous documents and depositions were introduced, and a great deal of testimony was taken, expert and otherwise. The parties have timely submitted their closing briefs and replies thereto. Now, after a review of the materials submitted by the parties, I find as follows.

FACTS

On May 6, 1968, LP & L and United signed a contract which provided that United would supply and LP & L receive all of the fuel required at LP & L's Ninemile power plant in Westwego, Louisiana, until such time as a new power producing unit was installed at the plant. After that time, the contract called for the supply and receipt of one third of all fuel requirements at the Ninemile plant, not to exceed a daily maximum delivery of 80,000 Mcf of gas, and an hourly maximum delivery of 4,000 Mcf.

The rates provision of the contract (Article XIV) provided that the rates charged to LP & L throughout the term of the contract would vary: from the signing of the contract until April 1, 1973, two fixed rates were charged; thereafter, a so-called step rate would be in effect, whereby the price of gas would fluctuate according to the amount taken by LP & L. The step rate would also fluctuate according to the weighted average purchase price of gas ("WAPPOG"),[1] in various areas where United bought gas to supply LP & L. The contract term providing that LP & L's rates should be tied to a series of geographically limited WAPPOGs is the focus of the parties' dispute. It is also quite complex, and I will address it in detail below.

The trouble started in the mid–1970's. By that time, LP & L's new unit was functioning at the Ninemile plant, and United was supplying a part of the Ninemile plant's requirements pursuant to the step rate and WAPPOG provisions of the 1968 contract. At first, things seemed to go well. But, with the heavy demand placed on the domestic petroleum industry in the mid–1970's, United found that it could not rely on locally supplied gas to fulfill its obligations to large consumers like LP & L.[2]

As a result, United began to go further and further afield to purchase the gas it supplied locally: it became a frequent purchaser of gas in places like Oklahoma and West Texas, and sometimes bought gas in places as far off as Wyoming and Colorado.

1. The parties refer to both the "weighted average purchase price of gas" and "weighted average costs of gas" at different times and places. The terms are undistinguishable for my purposes.

2. United's difficulties in obtaining a ready supply of gas are at least partly its own fault.

During the 1960's it released many of its local reserves of gas, and did not buy others, perhaps believing that local supplies of gas would always be available on the market. *See Defendant's Ex. 114,* at page 10. That turned out not to be the case.

It also entered into an agreement with Northwest Alaskan Pipeline Company to buy gas at the Canadian border in order to transport and trade that gas to Northern Natural Gas Pipe Line Company in Iowa. In return, United received gas owned by Northern Natural in the New Orleans area.

Even these measures proved insufficient to supply the demand experienced by United, however, and it found that it was forced to go before the Federal Energy Regulatory Commission ("FERC") in order to allocate its insufficient supply of gas among its customers throughout the 1970's and periodically during the early 1980's. In the natural gas industry, this is known as "curtailment." During this period, LP & L's other supplier of gas at the Ninemile plant, Texaco, also began to curtail deliveries. These actions left LP & L with a critical undersupply of gas.

When the amount of gas supplied by United and Texaco began to dwindle, LP & L had great difficulties in maintaining its takes of gas at levels acceptable to United. At this time, LP & L controlled the amount of gas it took from United, and very often exceeded the amount which was allotted to it during United's curtailment. In fact, on some days LP & L seems to have treated United's delivery pipe to Ninemile the way a 12–year old treats a straw in a Barq's Sasparilla on a day in late July: on those days, it slurped for all it was worth, and sometimes exceeded 80,000 Mcf in takes.

During United's curtailment, the lack of fuel supply at the Ninemile power plant continued to harm LP & L because the power producing units there (and particularly the new unit) were more efficient than those elsewhere in LP & L's power production system. Because of this, LP & L approached United with a request that it transfer gas which United's curtailment had allocated to LP & L's Sterlington power station from that station to the station at Ninemile. The price was understood to be that recited in the original agreement between the parties with regard to United's delivery of gas at Sterlington, rather than the 1968 contract price. Because the Ster-

lington price was less than the going rate (although more than the 1968 contract price), LP & L benefitted by the transfer, which was consummated by letter agreement dated February 13, 1980. In that agreement, LP & L makes a reservation of rights which was at least meant to reserve any legal claims it might have in the FERC litigation then pending between the parties. Whether it was to have any other effect is hotly disputed, and will be discussed below.

The relationship of the parties began to deteriorate significantly throughout this period, and culminated in litigation before FERC, the Louisiana State Courts, and here. Those were not the only legal proceedings faced by United, however. United was also sued by Mississippi Power & Light, another large utility company to which United delivered gas pursuant to a contract similar to the one sued upon here.

In connection with their various legal disputes, United permitted LP & L to audit its books as provided by section V of the 1968 contract. LP & L believed the audit showed that United included a number of impermissable items in the calculation of the WAPPOGs for Lafayette and New Orleans. After investigating its claim, LP & L also believed that the errors made in calculating the WAPPOGs were deliberate, and amounted to fraud accomplished by use of the mails and interstate telephone system. At the same time, LP & L felt badly used by the Sterlington agreement, which allowed United to charge a price in excess of the 1968 contract price at the same time it was curtailing gas deliveries it was obligated to make pursuant to the contract.

On October 23, 1984, LP & L filed suit in this Court, seeking a preliminary injunction and damages for alleged violations of the 1968 contract, and damages for payments made pursuant to the Sterlington transfer agreement. The preliminary injunction was never heard, and I now dismiss the prayer for it as moot. On November 25, 1985, LP & L amended its complaint to take account of what it believed was United's deliberate fraud by mail and wire, and

stated a claim under 18 U.S.C. § 1964. I note for the record that United has stated a counterclaim against LP & L, seeking to recover damages for those volumes taken in excess of the maximum provided for in the 1968 contract. That counterclaim was severed, and is scheduled to be tried at a later date.

ISSUES

The evidence produced by the parties at trial raises a myriad of issues. In regard to the 1968 contract, the parties raise the issue whether the WAPPOGs for the Lafayette and New Orleans areas were inflated by: first, United's purchase of gas in areas outside those specified in Exhibit A to the contract; second, United's failure to credit LP & L with refunds it received from producers whose gas was used to supply LP & L; third, United's inclusion of certain transport costs associated with the purchase of offshore gas, and the allocation of those costs to areas specified in the contract; fourth, United's inclusion of charges for the use of offshore transport facilities in the WAPPOG; and fifth, United's inclusion of gas it acquired by virtue of the Northern Natural Exchange Agreement in its calculation of the New Orleans area WAPPOG.

The parties also raise an issue as to the delivery obligation of United under the 1968 contract. United insists that it was obligated to deliver only one third of LP & L's requirements, not to exceed 80,000 Mcf, at the Ninemile plant on any given day, and LP & L responds that United was obligated to deliver daily any amount LP & L chose to take, up to 80,000 Mcf. Because it is necessary to decide exactly what volumes of gas the parties intended should be priced according to the 1968 contract, this issue must be decided to determine what damages, if any, LP & L is entitled to collect.

As regards the Sterlington transfer agreement, the issues raised by the parties concern whether or not LP & L's reservation of rights gives it the right to challenge

the price it paid for gas pursuant to the letter agreement, and whether or not any damages done to LP & L by the payment of that price have already been recovered in the State Court proceeding. LP & L suggests that the volumes it received pursuant to this agreement should have been delivered under the 1968 contract, at a lower price than that of the Sterlington letter agreement, and that the reservation of rights contained therein included a right to sue here. United responds that the right claimed here was never reserved, and that LP & L has already recovered any damage done to it by the Sterlington agreement in a previous lawsuit before the State Court.

The last area of controversy is LP & L's RICO claim. United argues that LP & L has not shown United had any intent to defraud as required by the statute; that LP & L has not shown that the damage done to it was caused "by reason of" a statutory violation of 18 U.S.C. § 1961 et seq., as required by the statute for the recovery of the civil remedy provided by 18 U.S.C. § 1964; that LP & L has not proven a "pattern" of activity as required by the statute; and that LP & L's supposed RICO claim has, in any event, prescribed. LP & L responds to all these arguments, and insists that it has proven its right to treble damages and attorney's fees as provided for by the statute.

I will address each of these issues in turn.

DISCUSSION

*1. The 1968 Contract*

The parties disagree about the meaning of various parts of the 1968 agreement. The principles to be applied in this diversity case to determine what the agreement means are the familiar ones embodied in the Louisiana Civil Code and the caselaw. *Erie R.R. Co. v. Thompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The contract should be construed in accord with the parties' intent, and their intent should be given effect. LSA–C.C. art. 1945, 1950.[3]

---

**3.** These sections of the Civil Code (and the others cited throughout the opinion) were recodi-

fied by the 1984 revision of the Code, which became effective on Jan. 1, 1985, sometime after

Their intent should be determined by the words of the contract, where the words are clear and explicit and lead to no absurd consequences. *Schwarz v. Bourgeois,* 422 So.2d 1176, 1178 (La.App. 4 Cir.1982). The words of the contract should be interpreted in common sense fashion, and given their ordinary meaning in the absence of any indication to the contrary. *Lambert v. Maryland Casualty Co.,* 418 So.2d 553, 559 (La.1982); LSA—C.C. art. 1946. Each clause of the agreement must be interpreted in relation to the others, giving to each the meaning which is implied by the contract as a whole. LSA—C.C. art. 1955; *Schwarz, supra,* at 1178. And while contracts should be construed with the recognition that informed and experienced persons do not customarily bind themselves to unjust and unreasonable obligations, a court should not be concerned with the wisdom or folly of a contract, and any conditions in it should be construed as the parties must be supposed to have understood them at the time of its execution. LSA—C.C. arts. 1945, 1953, 1964–66; *Henry v. Ballard & Cordell Corp.,* 418 So.2d 1334 (La.1982); *Schwarz, supra,* at 1179.

■ The first of the parties' disputes centers on Article XIV of the contract, which set the rates of payment made by LP & L during the time in question. The meaning and application of this term are bitterly contested. As noted previously, the rates provision in effect after April 1, 1973, was a step rate provision which was intended to vary with the amount of gas taken by LP & L (as a practical matter, LP & L would almost always take enough gas to get the lowest rate). This step rate was to be adjusted by tying it to the weighted average purchase price of gas paid by United. The parties intended that this adjustment would turn the contract into a cost-plus contract, allowing United a small margin of profit on the gas it sold to LP & L.

The calculation of the weighted average purchase price of gas is set out in detailed instructions in Article XIV. I quote in full the provisions relevant to the dispute here:

this lawsuit was filed. None of the recodifica-

Weighted average purchase price of gas in the New Orleans Area, or any other area, as outlined in Exhibit A attached hereto, shall be determined by: (1) adding together all the volumes of gas which Seller purchased in the area and transferred into the area during the preceding billing month; (2) adding together the cost payable by Seller for the gas it purchased in the area and the cost assignable to the gas transferred into the area during the preceding billing month; and (3) dividing the total of said costs payable by the total of said volumes purchased in and transferred into the area. The resulting quotient shall be the weighted average purchase price of gas in the area. In computing weighted average purchase price, costs as used in the steps outlined above shall be:

(a) Cost assignable to gas transferred into an area shall be the result obtained by multiplying the weighted average purchase price of gas in the area, from which the gas is transferred, by the volume of gas transferred.

(b) Cost of gas purchased on the seaward side of the shorelines of Florida, Alabama, Mississippi, Louisiana and Texas, under contracts executed after January 1, 1968, shall be the amount payable to the producer, pipeline or other seller thereof, plus the amount, if any, payable by Seller to others for delivery of the gas onshore; or, if Seller's facilities are used to deliver such gas onshore, an amount obtained by (i) dividing ¹⁄₁₂th of 25% of the depreciated investment, at the beginning of the preceding billing month, in Seller's facilities used to deliver such gas onshore by the total volume of gas delivered through such facilities during said billing month, and (ii) multiplying the result so obtained by the volume of gas purchased under contracts executed after January 1, 1968, and delivered through such facilities during said billing month.

(c) The cost of any other gas purchased by Seller shall be the amount

tions changed the law.

payable by Seller to the producer, pipeline or other seller thereof; provided, that in the computation of the weighted average purchase price for the Jackson Area neither the cost nor volumes of gas purchased by Seller from Tennessee Gas Pipeline Company for sale in northern Mississippi shall be included in the computation.

The "Exhibit A" referred to in Article XIV is a map of the local Southeast. A copy of it is attached to this opinion. On it are shown United's pipeline system, the states of Texas, Arkansas, Oklahoma, Louisiana, Mississippi, and Alabama, smidgeons of Florida and Tennessee, and their major cities. Also shown are a number of "areas" outlined in red, which overlay the other items on the map. There are six such areas, each with its own name. The names are: the Southwest Texas Area, the Northern Area, the Beaumont-Houston Area, the Lafayette Area, the New Orleans Area, and the Jackson Area. As the names indicate, these areas cover East Texas, Louisiana, Southern Mississippi, and small parts of Alabama and the Florida panhandle. They do not reach Oklahoma, Arkansas, or Northern Mississippi.

Plainly, Exhibit A is an integral part of Article XIV of the contract. Article XIV refers constantly to areas, and the only guideline as to what those areas might be is Exhibit A. I take it that the parties, by attaching Exhibit A to the contract, meant to illustrate what was meant by the word "area" as used by them in the contract's pricing provision. To find otherwise would be to render Exhibit A surplusage, and would make its attachment to the contract virtually meaningless. This I refuse to do. The evidence tended to show that these parties were very sophisticated, and unlikely to attach anything to a contract which was not meant to influence its meaning.

Having so found, I read the intent of the parties, as embodied in the clear language of Article XIV, to be as follows. The contract and Exhibit A meant to link the price of gas charged to LP & L to the weighted average price of gas purchased in the areas outlined in Exhibit A. At the time the contract was entered, those areas were understood to be the ones in which United would buy gas to supply LP & L. This was not unreasonable. After all, the areas shown on Exhibit A are and have always been relatively rich in fossil fuels.

LP & L did not want to pay for the cost of fuels that were produced in distant areas for precisely that reason—it felt that the ready local supply of fuel justified it in negotiating a price term that would tie its price to local costs of production. United was ready to agree to this because it believed that fuel would remain readily available locally and offshore during the term of the contract. The parties therefore negotiated a price which would be determined by the price prevailing in the areas set out in Exhibit A.

This price was to exclude the cost of fuel outside those areas, and float with the cost of fuel within them. It was also to take account of the cost of delivering gas from offshore, an event which was becoming increasingly frequent during the 1960's. The idea was to charge LP & L for local and offshore gas because that was the gas from which it derived a benefit. As will be seen, the trouble here is that United now wants to apply the spirit of the contract to LP & L's obligation (i.e. LP & L should pay for any and all gas that benefits it), while LP & L insists that only the letter of the contract should apply to it (i.e. LP & L should only pay for what the parties originally intended, not something else).

The above interpretation of the contract agrees with the language used. In the first paragraph, the contract speaks of the WAPPOG or WAPPOGs in terms of related areas. It states that the WAPPOG "in the New Orleans Area, or any other area, as outlined in Exhibit A shall be ..." and then outlines the formula for determining the WAPPOG. It then states that "the resulting quotient shall be the weighted average purchase price of gas *in the area.*" [My emphasis]. The term "area" is not defined in the contract, and the only hint as to what it might mean is Exhibit A.

In subsection (a), the contract goes on to identify the way in which costs are to be assigned when gas is transferred from one "area" to another "area." This provision must be referring to the areas outlined on Exhibit A, because it assumes that the "area" from which the gas is transferred will have a WAPPOG, and at trial the parties agreed that it would be absurd to try to calculate WAPPOGs for amorphous, undefined areas not shown on Exhibit A.[4] In sum, the price provisions of the contract refer to the term "area" throughout, and that term is defined only by the map attached to the contract as Exhibit A. I take it that the terms "area" and "areas" were therefore meant to be defined by Exhibit A, and that they do not refer to Oklahoma, Wyoming, and etcetera.

United argues that the language of subsection (c), the general cost provision for gas other than that bought offshore or transferred from another area into the New Orleans area, precludes a finding that Exhibit A was meant to illustrate the exclusive areas from which costs could be assigned to LP & L. It argues that the specific exclusion of gas purchased "in Northern Mississippi" found in subsection (c) makes no sense if such gas would have been excluded anyway by my interpretation of Exhibit A. (Defendant's Brief, p. 150). That is, it argues that if Exhibit A is meant to be exclusive, the parties would not bother to mention and exclude gas purchased in Northern Mississippi.

The simple answer to this is that the clause cited by the defendant, by its plain language, does not mean what the defendant suggests. The clause reads "provided, that in the computation of the weighted average purchase price for the Jackson Area neither the cost nor volumes of gas purchased by Seller from Tennessee Gas Pipeline Company ("Tennessee") for sale in northern Mississippi shall be included in the computation." The clause does not re-

fer to gas *purchased in* northern Mississippi. Rather, it refers to gas bought in Jackson which was to be *sold in* northern Mississippi. The evidence given at trial tended to show that Tennessee had pipeline running throughout the areas shown on Exhibit A (in fact, that company sometimes transported gas in areas shown on Exhibit A on behalf of United), and that United sent a large amount of gas through the Jackson area to serve customers in northern Mississippi. *See* Tr. p. 986. In these circumstances, it is not unreasonable to conclude that United bought gas from Tennessee in the Jackson area, and piped it to northern Mississippi. Naturally, LP & L would want that gas excluded from the calculation of the Jackson WAPPOG, because it was not used to service the New Orleans area. Although the record is not as clear on this issue as it might be, I conclude that is the origin and meaning of this term, and that it does not conflict with the general intent and meaning of the contract as I have outlined it above.

In short, I find that the parties negotiated a price term in the 1968 agreement that reflected their belief that the supply of gas in the local area would remain plentiful, and would be the gas actually supplied to LP & L. The local supply of gas on shore would be supplemented by offshore reserves. The parties intended that the price charged to LP & L would reflect the costs of gas in the areas outlined in Exhibit A, and would not include the cost of gas purchased on shore elsewhere. Each of the areas on Exhibit A would be assigned a WAPPOG, and that WAPPOG would be used to determine the cost of gas flowing from area to area on Exhibit A, when such transfers were necessary to service LP & L.

With these conclusions in mind, I turn to the specific issues raised by the parties.

---

4. This provision also tends to prove that the areas shown on Exhibit A were meant to be exclusively those from which United would supply LP & L. It assumes that any gas transferred into LP & L's home area (New Orleans) will have a WAPPOG, and it is hard to see how any area could support the calculation of a WAPPOG unless it was clearly defined—as is the case with the areas mapped out on Exhibit A.

### A. Gas Purchased Outside the Exhibit A Areas

I find that the costs of gas purchased outside the areas delineated by Exhibit A cannot be included in the WAPPOGs of New Orleans and Lafayette, or, for that matter, any WAPPOG for any area in Exhibit A. United argues that this gas should be included in the costs charged to LP & L because it was actually used to supply LP & L, and that the spirit of the contract is to tie the price charged to LP & L to the cost of supplying LP & L. That is true. The contract does generally embody a system that is meant to charge LP & L a price based on United's cost of supply. But it also embodies an assumption that the supply will be derived from reserves in areas nearby and offshore, and a very specific intention that LP & L should be charged a price that reflects the ready supply of gas in those areas.

United protests that it was forced to go to Oklahoma, etc. in order to supply gas to LP & L during the 1970's because of the short supply of local gas. It suggests that the alternative would have been to supply less gas to LP & L (United was already doing this as a result of curtailment), a situation that would have been of no benefit to anyone. Again, these arguments are completely accurate: United was forced to go beyond its traditional areas of supply during the period of short supply in the 1970's, and its only alternative would have been to supply even less gas to LP & L than it did. But one of the things contracts do is allocate risks among the parties. Most often, the supplier takes the risk that supply will be short, and that a shortage will cost him greater expense, or force him to breach his obligation. The contract at issue here clearly allocates this risk to United: it makes United responsible for supplying LP & L's requirements without any condition or reservation. Accordingly, I find that United's increased costs of supply, in the form of distant purchases of gas, cannot be charged to LP & L by including them in the WAPPOGs required by the contract.

### B. Refunds Received by United

At trial, the parties agreed that some amount is due to LP & L to reflect refunds which were received by United from producers of gas that flowed to LP & L. Apparently, many of these refunds were automatically credited to LP & L when producers of gas gave United refunds in the form of a reduced price, which United then entered into the WAPPOG calculation required by the contract. But some refunds were given in the form of direct cash payments to United. United did not credit these to LP & L's account because the 1968 contract did not contain any provision that explicitly obligated it to do so. United now agrees that these refunds should also be credited to LP & L's account because they resulted in a decrease in "the cost of gas purchased by the Seller" in the areas present on Exhibit A. United should credit them to the specific areas on Exhibit A where the relevant gas was purchased, thereby reducing the WAPPOG for each such area. This approach seems justified by the contract's language, which speaks of the cost in "the New Orleans area, or any other area." Once the refunds are assigned to the areas to which they belong, the various WAPPOGs should be re-computed, and the transfer (cost assignable) provision of subsection (a) applied where necessary.

### C. Offshore Gas Charges

The parties have a number of disagreements over the charges to be included in the WAPPOGs under subsection (b) of the pricing provision. That subsection is meant to capture the cost United incurred to supply LP & L with gas from offshore, and it allows United to pass those costs on to LP & L. It covers two kinds of offshore gas: that purchased by United from another supplier who would then transport it ashore, and that transported ashore by United itself, through offshore facilities it owned in partnership with others. The meaning of both clauses was hotly debated at trial.

■ The first area of dispute concerns the phrase in subsection (b) which allows United to include in the WAPPOGs "the amount, if any, payable by Seller to others for delivery of the gas onshore." United maintains that this phrase allows it to include in the WAPPOGs not only the amount it cost the third-party seller to transport the gas sold to United from offshore to the shoreline, but also any amount it cost United to transport the gas in a third-party pipeline from the shoreline to United's main pipeline system. The inclusion of these costs has caused much wailing and gnashing of teeth on the part of LP & L. LP & L argues that only the cost of transportation to the shoreline is includable in the costs passed on to it through the WAPPOGs, and demands that any cost associated with transporting gas from the shoreline to United's pipeline (i.e. transport from one point on shore to another) be removed from the price it paid for gas.

Essentially, this is a dispute about the meaning of "delivery ... onshore." As noted above, this phrase should be given its commonsense, ordinary meaning, absent some indication to the contrary. *Lambert, supra,* at 559. No definition of "delivery onshore" is given in the contract, so I must rely on the common sense of the words to discover the parties' intent.

I find that I must rule for LP & L here. If the parties had intended "delivery onshore" to include transportation from one point on shore to another, they could have so defined that term. They might also have made such an intention explicit by using the phrase "delivery to United's pipeline system." They did not do either of these things, and the clear sense of the phrase implies that LP & L's duty to pay the costs incurred by United ended when the gas reached the shoreline. I conclude that the parties did not intend that United's cost of moving the gas after it reached land should be passed on to LP & L through the WAPPOGs.

■ The parties' second disagreement about the application of the above-quoted phrase centers on the allocation of offshore transportation costs to the various areas shown on Exhibit A.[5] LP & L complains that United has allocated the costs of offshore transportation to areas other than those to which the gas is delivered on shore. United admits that it has done so, but argues that this allocation was proper because it placed the costs of offshore transportation in those areas where the gas entered its main pipeline, and it was those areas that actually used the gas.

For example, a significant amount of United's offshore gas was delivered on shore (crossed the shoreline) in the Johnson Bayou area shown on Exhibit A. The Johnson Bayou is clearly in the "Beaumont-Houston Area" of Exhibit A. But the vast majority of this gas entered United's main pipeline and serviced customers in the Lafayette and New Orleans areas. In this situation, United felt it was proper to allocate the costs of that gas to Lafayette and New Orleans, as it was there that its customers (including LP & L) actually used the gas. For this reason, it included these costs in the New Orleans and Lafayette WAPPOGs rather than the Beaumont-Houston WAPPOG. This had a tendency to increase the WAPPOG in the areas to which the gas was allocated, because the offshore gas tended to be somewhat more expensive to produce.

Nothing in the price provision of the contract explicitly addresses this issue.

5. At trial, testimony was given to the effect that United had varied the boundaries on Exhibit A slightly, and was now billing LP & L based on the newly established areas or "districts." LP & L rightly complained about this practice. United should cease billing LP & L on the basis of cartographic limits not present on Exhibit A. The parties bargained for and agreed to Exhibit A, and their contractual relationship must be governed by it.

Of course, this observation applies to LP & L as well. Apparently, LP & L's audit included in its calculation of the Lafayette WAPPOG four relatively cheap gas producing fields in the Johnson Bayou area. This had the effect of lowering the Lafayette WAPPOG by including Beaumont-Houston gas in it. The gas produced in those fields must be allocated to the Beaumont-Houston WAPPOG.

However, the price provision generally contemplates that volumes of gas will be figured into the WAPPOGs of the Exhibit A areas where they are first produced or purchased, i.e., where the gas first appears in Exhibit A, rather than where it is actually used. Gas purchased or produced in one area and later sold in another area is generally not added into the WAPPOG calculation for the area in which it is sold, but is assigned a cost by adding it to the WAPPOG for the area in which it is originally produced. *See* Article XIV(a). Moreover, there is no mention in any of the provisions in Article XIV of the contract that gas costs will be assigned to the areas where the gas enters United's main line, rather than the area where it first appears within the boundaries of Exhibit A. For these reasons, reading the contract as a whole, I find that the parties intended that the costs of offshore gas should be assigned to the WAPPOGs of those areas in which the gas came ashore, because those areas are the ones in which the gas first appears within the boundaries of Exhibit A. Thus, the gas that came ashore in the Beaumont-Houston Area should be included in the Beaumont-Houston WAPPOG and then treated as a volume transferred into New Orleans or Lafayette, includable in their WAPPOGs under Article XIV(a) rather than the general provision of Article XIV.[6]

The second clause of subsection (b) of Article XIV is meant to allow United to recapture its cost of transporting offshore gas it purchases through facilities it owns offshore. The facilities owned by United include segments of offshore pipeline, compressors, platforms, and etc. In most cases, United owns these facilities jointly with other gas suppliers, and purchases only a part of the gas passing through them.

The parties dispute everything about this clause except the numbers and the date. They argue as to whether United has shown enough specific information about the facilities to properly support such a charge; they argue as to the meaning of "total volume"; and they argue as to the proper allocation of the facilities charges among the New Orleans, Lafayette, and Beaumont-Houston areas. After considering each of these arguments, I find as follows.

■ With regard to the allocation argument (i.e. the argument about where these facilities charges should be figured into the WAPPOGs), I find that the charges should be allocated to those areas where the gas crosses the shoreline. The reasons for this finding are the same as given above: the contract does not specifically allocate the facilities charges among the areas mapped out on Exhibit A in any way, but it does generally provide that the area in which gas is first produced or purchased should be the one to which the costs of that gas are allocated. Allocating facilities charges to the areas (New Orleans, Lafayette, and Beaumont-Houston) in which the volumes to which they are attached come ashore most nearly approximates this.[7] If those volumes are later transferred somewhere else, they should be figured into the second area's WAPPOG by reference to the transferred volumes clause, Article XIV(a).

■ The parties also disagree as to the meaning of the phrase "the total volume of gas delivered through such facilities" as it

---

**6.** The defendant pointed out at trial that LP & L's audit mistakenly allocated the volumes and costs of offshore gas delivered through United's Stingray pipeline to one area (Lafayette) and the transportation cost to another (Beaumont-Houston). Because this gas was relatively cheap, this had the effect of lowering the Lafayette WAPPOG.

It is undisputed that the Stingray pipeline comes ashore at Johnson Bayou. Both the costs of the gas in the pipeline and the transportation cost of the gas should therefore be included in the Beaumont-Houston WAPPOG. If the gas is

later transported to Lafayette, it would make its way into the Lafayette WAPPOG in the form of volumes "transferred" under Article XIV(a).

**7.** I believe the allocation of the facilities charges should match that of the transportation costs, as the two terms are really counterparts of one another. The first is meant to track the cost of transporting gas through other pipelines, and the second is meant to track the cost of transporting gas through facilities owned, at least in part, by United.

is used in Article XIV(b)(i). LP & L maintains that the phrase "total volume" means the total of all volumes delivered through the facilities at issue, whether those volumes were owned by United or not.[8] United argues that the phrase means all volumes of United's gas to travel through the facilities, and that volumes owned by others were not meant to be included.

United certainly has the better of this argument. I do not see any reason why the parties would worry about volumes owned by and delivered to others when they negotiated the 1968 contract. In fact, exactly the opposite was the case: in 1968, the parties sought to negotiate a cost-plus contract that would track United's costs. It is obvious that gas owned by others has very little to do with United's cost, and that the phrase "total volume" can only have referred to the total volume of gas owned by United.

Moreover, the reading suggested by LP & L would produce an absurd result. As noted above, United owns the offshore facilities in question jointly with other transporters. In calculating the facilities charge United may include only that portion of the facilities which it owns. For example, if United owned a 20% share of a facility valued at $1000, only $200 of that facility's value would be subject to the calculation of the facilities charge. Under LP & L's theory, United would be expected to make that allocation, but would then be required to divide that 20% by 100% of the volumes actually flowing through such facilities, including the volumes owned by the other 80% owners of the facilities. This would result in an absurd mismatch of dollars with volumes.

The parties' final disagreement focuses on the amount of documentation required of United before it may properly include a facilities charge in its calculation of a WAPPOG. LP & L argues that United must produce records of all volumes of gas (including those owned by others) passing through the facilities in order to document the facilities charge properly. It also argues that United must show by documentation that the facilities for which the charge is computed were actually used during the billing period, before a facilities charge may be imposed. United argues against both of these positions.

██ I find that I must reject the first of LP & L's arguments. I found above that United did not need to include in its calculation of the facilities charge those volumes of gas owned by others. Therefore, as long as United can and does produce records of its own share of the volumes of gas that pass through its facilities, it has done all that is required by the contract. The parties do not dispute that United has done that much, and I find that United need not produce records of gas owned by others to properly make a calculation of its facilities charge.

██ I find LP & L's second argument persuasive, however. The contract states that the charge is to cover facilities "used to deliver ... gas." And, as noted above, the general intent of the contract was to tie the price charged by United to its costs in any one month. Facilities which were not used to deliver gas in a month would not come within the definition of the above-quoted phrase for that billing period, nor would their operation be a cost paid by United to supply gas to LP & L.[9] For these reasons, I find that United must produce documentation to show that any one facility was used to transport United gas in a month if it wishes to include a charge for the use of that facility in a WAPPOG.

United suggests that requiring it to prove that its facilities were used in any one month is unduly burdensome, because of the great number of facilities involved. But it admits that it has catalogued each

---

8. This would tend to decrease the facilities charge by increasing the denominator in the required calculation.

9. In fact, if United were allowed to charge LP & L for facilities in months when they were not used, they would be the source of a windfall profit for United rather than a type of cost associated with supplying gas to LP & L.

item of equipment used to transport gas for delivery to LP & L, and it also admits that it knows the exact amount of gas it transports through them each month. (Defendant's brief, at pp. 37, 39). I am convinced that if United knows this much, it will not be too difficult to identify those facilities which were actually used in a single month, and I rule that United must do so to support a facilities charge.

### D. The Northern Natural Exchange Agreement

■ As noted above, United entered into an exchange agreement with Northern Natural Gas Pipe Line Company ("Northern Natural") in order to alleviate some of the difficulties it was experiencing in acquiring adequate local supplies of gas in the mid–1970's. Under the agreement, United purchases gas at the Canadian border, and transports it to Ventura, Iowa through a pipeline company in which it owns a 12% interest (the Northern Border Pipe Line Company). In Iowa, the gas is delivered to Northern Natural. In exchange for the gas United delivers to Northern Natural by this method, Northern Natural delivers an equivalent amount of gas which it has purchased locally to United in the New Orleans, Lafayette, and Jackson areas.[10]

United does not dispute that the gas it acquires from Northern Natural is among the most expensive in its system. The cost of the Canadian gas is far greater than the cost of local gas. In addition, United includes in the cost of the gas acquired by exchange the costs of transportation from Canada to Iowa, which are significantly higher than the costs of transporting gas from offshore to the local areas.[11]

United argues that this gas may properly be included in the WAPPOGs for New Or-

leans, Lafayette, and Jackson on the basis that the gas is "purchased" locally by the exchange procedure sketched above. It suggests that the costs associated with the Northern Natural Exchange were costs spent to supply LP & L, and therefore are costs which the parties intended the plaintiff to bear in the form of the WAPPOG.

The 1968 contract contains no language that refers to exchanges of the kind at issue here, let alone any language that implies such transactions should be treated as sales. Moreover, the costs associated with the Northern Natural Exchange are incurred by United outside the areas outlined in Exhibit A to the 1968 contract. I gave my reasons why I believe the contract limits the costs that United may include in its WAPPOGs to those associated with locally available gas above, and I will not repeat them here, except to state that the entire Northern Natural Exchange appears to have been a desperate response to a problem of undersupply suffered by United. This was a situation which the language of the contract did not contemplate, and which, apparently, the parties could not foresee in 1968.[12] In fact, United did not even consider treating transactions like the Northern Natural Exchange as purchases until some ten years after the 1968 contract was signed.[13] Therefore, because the contract does not contemplate the inclusion of transactions like this in the contract price, I find that United improperly included the cost of the Northern Natural Exchange in its WAPPOGs to LP & L.

### 2. The Delivery Obligation Imposed by the 1968 Contract

■ The price claims decided above apply only to those volumes which LP & L took pursuant to the 1968 contract. Others would be priced according to the Sterling-

---

10. In fact, the evidence at trial showed that Northern Natural bid against United for the gas it bought locally.

11. United argues that these transportation costs are part of the price it pays for the gas it exchanges with Northern Natural.

12. In previous testimony, Mr. James Haynes, then Executive Vice President of United, testified that United did not know in 1969 it would buy gas outside the Exhibit A areas. *See Mississippi Power & Light v. United Gas Pipe Line Co.,* 609 F.Supp. 333, 337 (S.D.Miss.1984).

13. *See* Tr. 815.

ton Transfer Agreement or the market rate. Thus, it is necessary to decide what the delivery obligation of United is under the 1968 contract in order to determine LP & L's damages for United's miscalculation of the WAPPOGs.

The delivery obligation United assumed by the 1968 contract is stated in Article XI. That article provides that United shall supply 100% of LP & L's fuel requirements at the Ninemile power plant, not to exceed 125,000 Mcf of gas in any one day, until a fourth power producing unit went into operation at Ninemile in 1971. After that time United would be obligated to supply only a part of LP & L's requirements at the power station. This obligation is set out as follows:

(ii) During the period beginning on the date that Buyer places its new 750,000 KW Unit No. 4 into conventional commercial operation, 33⅓% of the fuel requirements of Buyer's said Ninemile Point Power Plant, not however, to exceed 80,000 Mcf of 1,000 Btu per cubic foot gas in any one day, which quantity shall thereafter be the Maximum Daily Delivery Obligation.

It is understood that in making deliveries of gas under this agreement Seller shall never be required to deliver in any one hour more than 1/20th of the Maximum Daily Delivery Obligation then in effect.

It is recognized that the remaining fuel requirements, after Buyer places into conventional commercial operation its new Unit No. 4, will be supplied from a source other than Seller. Buyer agrees that it will at all times use its best efforts to receive gas simultaneously from Seller and from Buyer's other source of supply in quantities equal to the percentage of Buyer's total daily requirements then being furnished by each respective source of supply. In taking such quantities of gas Buyer will use its best efforts to receive gas from Seller and its other source of supply at all times at the operating load factor of Buyer's said Ninemile Point Units 1, 2, 3 and 4.

The parties disagree violently over the meaning of this provision. LP & L argues that the parties intended that it would be able to call upon United to deliver any amount of gas up to 80,000 Mcf on any given day, and that the phrase "33⅓% of the fuel requirements" at Ninemile power plant meant only that LP & L would be required to take ⅓ of the fuel it required from United over the 22–year term of the contract. In other words, in LP & L's view, it could take nothing from United for 6.66 years, and then take all its requirements from United (up to 80,000 Mcf per day) for 3.34 years, and be in compliance with the contract over a 10 year period. United argues that the above provision obligates it to deliver ⅓ of all gas required at the Ninemile facility in any one day, up to a total of 80,000 Mcf, and that LP & L is obligated to take from United ⅓ of its requirements on any given day. I find that United's interpretation, with some modification, is the right one.

The interpretation urged by LP & L cannot be reconciled with any reasonable intent of the parties. It is obvious that the parties entered into the 1968 contract in order to allow LP & L's fuel usage to vary with the demands made upon it by its customers, and it is equally obvious that the setting of United's delivery obligation at ⅓ of LP & L's requirements was done to ensure that United's deliveries would not be determined by LP & L's whim, but by the variations in LP & L's actual usage. Both parties, after many years of doing business together, had a good idea what LP & L's fuel usage would be at any given time, and this allowed United to plan sensibly for the demand LP & L's requirements would make on its system. Such planning would be impossible if United were required to operate under the interpretation advanced by LP & L, a contingency for which no business would negotiate.

Also, the language of Article XI itself supports the interpretation United argues for. The passage states that the "Buyer agrees that it will at all times use its best efforts to receive gas simultaneously from

Seller and from Buyer's other source of supply ..." This clearly obligates LP & L to take fuel from United each time it takes fuel, rather than obligating it only to take fuel over the 22 year term of the contract.

In fact, LP & L's own witnesses implied that LP & L understood that it was required to balance its take of fuel between United and Texaco at all times,[14] and that it requested the best efforts language because a perfect balance was not mechanically possible, though a fairly close balance was (i.e. within 2–3%). *See* Plaintiff's Ex. 78. Moreover, in prior proceedings, LP & L's own witnesses, including Mr. Rodrigue, its chief executive officer at one time, took the position advocated by United here. *See* Def.'s Ex. 259–0. And several of LP & L's internal memoranda reflect its understanding that it should take ⅓ of its fuel requirements from United at all times. *See* Def.'s Ex. 16, 52, 225. All of this evidence weighs against LP & L's position that it was only obligated to take ⅓ of its requirements over the term of the contract.

Lastly, I note that the interpretation argued for by LP & L would come dangerously close to destroying the mutuality of obligation required for a valid contract. LSA—C.C. art. 2034. For, while LP & L would, by its interpretation, be obligated to take ⅓ of its requirements from United over 22 years, its interpretation would place United largely at the mercy of LP & L's whim or caprice on any given day, and for long periods of time. Such a situation would be a one way street in favor of LP & L, whose supposed obligation under the contract (to take any amount up to 80,000 Mcf, or no amount, on any given day) would pale in comparison with United's supposed duty to have 80,000 Mcf of gas available to LP & L on each and every day. *Cf. Dockson Gas Co. v. S. & W. Const. Co.,* 12 So.2d 847, 850 (La.App. 2 Cir.1943).

Therefore, I find that United was obligated to deliver to LP & L ⅓ of LP & L's fuel requirements at the Ninemile power plant during the time period covered by this lawsuit, and I find that LP & L was obligated to exert its best efforts to take ⅓ of its fuel requirements from United at all times, up to a limit of 80,000 Mcf of gas per day. I also find that United could not be called upon to deliver more than ¹⁄₂₀ of LP & L's daily fuel requirements in any one hour.

Unfortunately, this does not end the matter. Both parties agree that LP & L could not ensure that it took exactly 33⅓% of its fuel requirements from United. Even with the installation of special equipment at the Ninemile plant, LP & L could only guarantee that its margin of error in its takes of United gas would be 2–3%. That is, LP & L could guarantee that it would always take 30–36% of its gas from United, but could not guarantee a perfect take of 33⅓% at all times. United understood this, and that is why the parties agreed that LP & L's obligation would be expressed in "best efforts" language—the inclusion of that language would give LP & L a little breathing space.

A further problem is that the parties appear to have believed that any errors in one period (an hour, day, or month) could be made up by LP & L in the next. So, if LP & L took 36% of its fuel from United in one hour, day or month, it could take 30% in the next hour, day or month to make good its variance from the obligation stated in the 1968 contract. LP & L believes that it had a right to make up this difference over the 22 year life of the contract. United argues that LP & L should have been within the 30–36% range each minute, and that it could monitor and control its takes constantly. The parties' experts suggested that any variance from the 30–36% figure could be accounted for day to day over the term of each monthly billing cycle. Tr. 1340, 1685. I find the last view the most persuasive.

 It seems to me that LP & L's engineers must have had plenty to do other than watch the meters that measured the flow of gas from United to LP & L, and

---

**14.** LP & L went so far as to install special equipment to ensure that it tool ⅓ of its fuel requirements from United at all times. *See* Def.'s Ex. 249–0.

therefore, I think it would be unreasonable to expect LP & L to hit the 33⅓% contract figure each and every day. I also think it would be unreasonable to allow them 22 years to hit that figure, for the reasons I stated above. However, it does seem to me that they could vary the amount of United gas they took over the term of any one billing period in such a way as to ensure that LP & L would be taking 30–36% of its total fuel requirements for that month from United. Accordingly, I find that LP & L was within the limits set by the contract in all months in which it took 30–36% of its total fuel requirements from United. In any month it took more than 36%, the amount above 36% would be priced in some way other than that set out in the 1968 contract (it would be priced at either the Sterlington rate, or market rate).

■ Even this doesn't end the matter, however, because LP & L's use of the word "requirements" is not identical to United's use of it. At trial, United insisted that the term "requirements" meant the actual amount of total fuel used at the Ninemile power plant, rather than the amount needed. LP & L took the position that the term "requirements" represents the amount that would be burned by LP & L at Ninemile if the supply of gas had remained steady throughout the period in question. I find that LP & L's position is the right one.

At trial, the evidence tended to show that the amount of fuel generation at LP & L's Ninemile plant was controlled by LP & L's parent, Middle South Utilities, from its headquarters in Arkansas. Each day, Middle South Utilities would determine how much power to generate at the Ninemile plant, and instruct LP & L as to the amount of power to produce. Middle South Utilities would decide how much power to produce at Ninemile on the basis of "economic dispatch," which means that Middle South Utilities would call on LP & L to produce power at Ninemile so long as it was economical to produce power there rather than carrying it by wire from some other power plant in the Middle South Utilities system. Thus, the economics of pro-

ducing power at Ninemile had a direct effect on how much power was produced, and any change in the availability of fuel which forced LP & L to purchase alternative fuels at a higher price than that set by the 1968 contract would cause less generation of power at Ninemile, and less fuel use.

When United and Texaco began to curtail their supply of gas to Ninemile in the 1970's, LP & L's use of the Ninemile facility was reduced because that use became somewhat less economical. Had United and Texaco simply supplied LP & L with fuel as LP & L called for it, the Ninemile power station would have been used more than was the case in the 1970's. This is so because power generation would have been comparatively cheap at Ninemile, where favorable gas supply contracts were in place. Thus, the amount of fuel actually used at the Ninemile power station depended on whether or not United and Texaco would have fuel available to supply under their respective contracts. If they curtailed their supply, LP & L would actually use less fuel, even if more expensive alternative fuel was readily available.

For these reasons, LP & L's requirements at Ninemile can't be measured by actual use. As I've noted, LP & L's actual use was largely determined by the amount of gas supplied at Ninemile by United and Texaco pursuant to their respective contracts. If I were to allow LP & L's requirements to be measured by actual use, I would be allowing United and Texaco to determine (indirectly) what LP & L's requirements would be, and reducing those requirements in response to United's and Texaco's curtailments of their deliveries. This seems to be an absurdity to me. In every requirements contract in my experience, the buyer determines what its requirements will be, not the seller.

The cases cited by defendant, *Dockson Gas Co. v. S. & W. Construction Co.*, 12 So.2d 847, 850 (La.App. 2 Cir.1943), and *Utah International, Inc. v. Colorado-Ute Electric Association, Inc.*, 425 F.Supp. 1093, 1097 (D.Colo.1976), are not to the contrary. For, while it is true that both

those cases stand for the proposition that a buyer's requirements should be measured by his "actual requirements" or "actual operation," what those words mean is that an amount equivalent to the buyer's actual need is all that should be supplied by the seller of fuel during a time of ready supply. That is, these cases, and particularly the *Utah International* case,[15] mean by the cited language that the buyer in a requirements contract may not take more from the seller than he actually needs or may use, and that a seller is only obligated to deliver that amount. So, if a seller has a delivery obligation of up to 50 of a hypothetical item covered by a requirements contract, the *Utah International* case holds that the buyer who actually needs only 35 of the items may not take more than that number, nor need the seller deliver more.

The situation and issues presented by the case before me are very different from those presented by the cases the defendant cites. As noted above, the defendant's curtailment of its deliveries to the plaintiff had the effect of reducing the amount of gas actually used by the plaintiff. But it is undisputed that the plaintiff would have taken more gas (and burned more fuel at the Ninemile station) if the defendant and Texaco had made more gas available to it. In this situation, because of a shortage of supply, LP & L's actual need for gas did not match its actual use of gas. But in the cases cited by United, the actual need for and actual use of fuel by the buyer did correspond because a ready supply of fuel was available to the seller. This makes the cases cited by United inapplicable here.

In sum, I find that LP & L's requirements in this case were equal to the amount of gas it would have used if United and Texaco had not curtailed their deliveries to the Ninemile facility. That is, LP & L's requirements during the period in question were the amount of gas it actually needed at the Ninemile power plant, determined by the principle of economic dis-

patch, and determined as if the supply of gas had remained constant during the 1970's. United's delivery obligation would then be ⅓ of that amount, up to 80,000 Mcf per day. This corresponds with United's contractual share of LP & L's actual need at Ninemile during the period in question, and LP & L should recover its contract claims on that amount of gas under the 1968 contract.

### 3. The Sterlington Transfer Agreement

United has served LP & L's generating station at Sterlington in northern Louisiana for many years. United's service to LP & L at Sterlington has always been rendered pursuant to contractual agreements separate from those by which it served the Ninemile power plant. In 1980, when United was still operating under the curtailment plan it then had in effect, it was serving LP & L at Sterlington under an agreement entered into in 1979.

In early 1980, the parties realized that LP & L would not use all the gas that United was making available at Sterlington in accordance with the curtailment allocation then in effect. They realized that this extra gas could be used economically at the Ninemile plant, and began to negotiate for the transfer of the gas from Sterlington to Ninemile. On February 13, 1980, the parties' negotiations came to fruition in the form of a letter agreement on LP & L stationery. *See* Def.'s Exhibit 139–K.

 The agreement provides that United will deliver a portion of the gas allocated to the Sterlington facility to the Ninemile power plant upon request from LP & L. The price is expressly agreed to be that recited in the 1979 agreement.[16] Lastly, the February 13, 1980 letter provides that

In making any purchase or delivery set forth by this agreement neither LP & L nor United makes any waiver of the con-

---

**15.** The *Dockson* case is not really germane to the point argued by the defendant here.

**16.** The price charged by United in the 1979 agreement was below the market price, although it was greater than that charged by the 1968 agreement for the Ninemile plant.

tentions in any litigation pending before any federal or state agency or court and specifically reserves all their [sic] rights asserted or that may be asserted in any proceeding before any federal or state agency or court.

LP & L has received and paid for a number of deliveries pursuant to this agreement without complaint or reservation. It now claims that the volumes delivered under this agreement should have been delivered and priced according to the 1968 contract rather than the letter agreement, and insists that it reserved its right to make this claim in the language quoted above.

I find that the reservation of rights clause quoted above cannot be read to have the effect the plaintiff insists it has here. At the time the clause was drafted, the parties were engaged in litigation before the Federal Energy Regulatory Commission (FERC) and a Louisiana State Court. In both those lawsuits, LP & L sought remedies for the effects of United's curtailment of its deliveries to the Ninemile power plant. The language of the reservation indicates that it was to apply to those litigations, rather than any litigation United might later file. For example, the reservation states that it applies to "any litigation pending before any federal or state agency or court," and the commonsense reading of that phrase indicates that the word "pending" meant pending at the time the phrase was written, and was not meant to include the claim made here, which was filed five and one half years after the 1980 transfer agreement.

■ The construction of the reservation clause argued for by the plaintiff has other problems as well. Such a construction would nullify the 1980 agreement, and would in effect make LP & L's agreement to the contract illusory. The plaintiff would read the reservation of rights clause as allowing it to challenge any term of the contract at any time; I find that such a construction amounts to a refusal to agree to the contract's terms. As a contractual

clause, the reservation of rights should not be construed in a way that defeats the contract if the clause can be construed to give the entire contract effect. LSA—C.C. arts. 1951, 1955.

■ Also, the construction of the contract for which LP & L argues repudiates the price term of a sales contract. Louisiana law deems the price term "essential to the contract of sale," and a failure to agree to such a term would amount to a failure to establish a sales contract at all. LSA–C.C. art. 1764. In essence, then, if I were to accept LP & L's construction of the reservation of rights clause at issue, I would be forced to find that the 1980 agreement was ineffective. I decline to do so.

Moreover, United could have refused to transfer any volumes of gas whatever from Sterlington to Ninemile, and that refusal would have been within United's rights as defined by the curtailment plan then in effect. In that event, LP & L would have gotten the benefit of the Sterlington gas only by using it at the less economical Sterlington facility at the Sterlington price. So United's agreement to deliver Sterlington gas at Ninemile did not amount to over-reaching. In fact, it appears to have been an act of courtesy to a long time customer—United transferred the gas in question at a time it could have withheld it, and its agreement to do so allowed LP & L to use the gas in its relatively efficient power plant at Ninemile, rather than in the less efficient Sterlington power plant.

In conclusion, I find that the reservation of rights in the 1980 Sterlington transfer agreement did not reserve to LP & L a right to challenge the price agreed upon. The situation at the time the agreement was negotiated, the behavior of the parties, the language of the agreement, and the fact that the construction urged by LP & L would render the contract nugatory all suggest that the reservation of rights was meant to refer only to the litigation that existed at the time the agreement was formed.[17]

---

17. United also argues that even if LP & L does

have an action on the 1980 agreement any dam-

### 4. Civil RICO

As noted above, LP & L amended its complaint on November 25, 1985, to allege a cause of action for treble damages and attorney's fees as provided by section 1964(c) of the RICO statute, 18 U.S.C. § 1961 et seq. The amended complaint alleges that the invoices United mailed pursuant to the 1968 contract were fraudulent within the meaning of 18 U.S.C. § 1341, and that United often quoted it prices over the phone that were fraudulent within the meaning of 18 U.S.C. § 1343. It alleges that these predicate acts constituted a pattern of racketeering activity, and that United used the funds it acquired by its fraud to operate its business in violation of 18 U.S.C. § 1962(a),[18] thereby triggering the treble damages remedy.

United argues that it is not liable for RICO damages for a number of reasons. First, it argues that LP & L never adequately proved that it had the specific intent to defraud required by 18 U.S.C. § 1341 and § 1343. Second, it argues that LP & L knew of the alleged fraud long before the amended complaint was filed, and that the RICO claim should therefore be prescribed. Third, it argues that LP & L never showed that its injury occurred "by reason of" the use of the funds it paid to United, as required by 18 U.S.C. §§ 1962(a) and 1964. And last, it argues that LP & L did not prove that United's actions constituted a "pattern of racketeering activity" as contemplated by the statute. After considering these arguments, I rule as follows.

### A. Intent

▉▉▉▉ United strongly urges that the alleged scheme at issue here is not punishable under the wire and mail fraud statutes. It argues that the facts show a contract dispute, not knowing fraud. But the crimes of mail and wire fraud are broad in scope, and the interpretation given them must be flexible enough to encompass any conduct falling below the mark of fair play and right dealing. *United States v. Fowler,* 735 F.2d 823, 827 (5 Cir.1984), *citing United States v. Curry,* 681 F.2d 406, 410 (5 Cir.1982). The leading case on this issue in the Fifth Circuit is *Blachly v. United States,* 380 F.2d 665 (5 Cir.1967). There, the court said:

> The fraudulent aspect of the scheme to "defraud" is measured by a nontechnical standard. Law puts its imprimatur on the accepted moral standards and condemns conduct which fails to match the "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." This is indeed broad. For as Judge Holmes once observed, "[t]he law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity." All that is necessary is that it be a "scheme reasonably calculated to de-

ages I might award here have already been recovered by LP & L in the State Court suit for damages resulting from United's curtailment, *City of New Orleans, et al. v. United Gas Pipe Line Co.,* Nos. 575–544 et al. (CDC for Parish of Orleans, Aug. 24, 1984), *appeal pending* Nos. CA–3613 et al. (La.App. 4 Cir.). In that case, the Court awarded LP & L damages for all volumes of gas which United failed to deliver under the 1968 contract as a result of curtailment. The Court included the gas delivered pursuant to the Sterlington agreement in the amount it determined United had failed to deliver under the 1968 contract. The Court therefore awarded damages on the Sterlington gas on the basis that it should have been delivered at the 1968 contract price.

Basically, then, United is correct to suggest that any damages sought by LP & L in this lawsuit have already been awarded in the State Court suit. But the State Court was never presented the price calculation issues presented here. I have found above that United over-stated its prices to LP & L. This would indicate that the amount awarded by the State Court is lower than it should be, because the difference between the 1968 contract price and the price LP & L paid is greater than that Court assumed. So, if I did find that LP & L had an action on the 1980 Sterlington agreement, not all of the damages claimed would be duplicative, though many would be.

18. The amended complaint also stated a cause of action under § 1962(c) which I dismissed on the ground that a corporation could not be both the "person" and "enterprise" contemplated by that subsection of the statute.

ceive persons of ordinary prudence and comprehension." [citations omitted] *Blachly*, at 671. To prove fraud, the plaintiff must show by direct or circumstantial evidence that the defendant had a knowing intent to defraud. *United States v. Kreimer*, 609 F.2d 126 (5 Cir.1980). But a "knowing intent to defraud" may be found when a defendant deliberately proceeds with reckless indifference for the truth, making representations that are baseless, and shutting his eyes to their probable falsity. *United States v. Frick*, 588 F.2d 531, 536 (5 Cir.), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979); *United States v. Dick*, 744 F.2d 546, 551 (7 Cir.1984); *United States v. McDonald*, 576 F.2d 1350, 1358 (9 Cir.), *cert. denied,* 439 U.S. 830, 927, 99 S.Ct. 105, 312, 58 L.Ed.2d 124, 320 (1978).

■ United also argues that because it is a corporation, it is incapable of directly having the intent required by the mail fraud statute. It urges that I must find some United employee had the specific intent to defraud LP & L in order to find that it committed a violation of 18 U.S.C. § 1341. This is a correct statement of the law: a corporation, being a de jure person, cannot by itself have a mental state of any kind, including the intent to defraud. For this reason, it can only have, and be liable for, the mental states of its various employees, when they act within the authority given to them. *United States v. Bi-Co Pavers, Inc.*, 741 F.2d 730, 737 (5 Cir.1984); *Bazal v. Belford Trucking Co., Inc.*, 442 F.Supp. 1089, 1101 (S.D.Fla.1977); *United States v. T.I.M.E.—D.C., Inc.*, 381 F.Supp. 730, 738 (W.D.Va.1974). Therefore, to find United liable for fraud, I must find that a United employee had the specific intent required by 18 U.S.C. § 1341 and § 1343.

■ Applying these principles, I find that United's conduct did not sink below the level of "moral uprightness, fundamental honesty, fair play and right dealing" during the greater part of the period during which LP & L alleges fraud. During the 1970's and early 1980's United suffered a serious problem of supply, and was forced to acquire gas in ways the parties had not originally contemplated. It sought to pass on many of the costs associated with its gas acquisitions to LP & L because the contract *did* contemplate that United would receive a cost-plus price for the gas it supplied to LP & L. The interpretation of the contract provisions that it implemented to achieve its purpose of passing its costs to LP & L was incorrect, and I am convinced that United (and those of its employees responsible for administering the contract) must have suspected that its interpretation was inaccurate. However, I find that United's interpretation was not so obviously incorrect as to indicate that it was engaged in a conscious attempt to bilk LP & L; rather, I find that United took an arguable position as to the meaning of the contract in order to continue supplying gas to LP & L, when the only other alternative was probably a total breach.[19]

■ The situation is different with respect to United's continued inclusion of certain costs in its WAPPOGs to LP & L after the Fifth Circuit's decision in *Mississippi Power & Light v. United Gas Pipe Line*, 760 F.2d 618 (5 Cir.1985). In that decision, the Fifth Circuit affirmed a District Court finding that United should be preliminarily enjoined from including in its WAPPOGs to Mississippi Power and Light (MP & L) certain costs which are virtually identical to those LP & L complains of here. At trial, United's executives acknowledged that they knew of the decision, and did not regard it as having any application to their contract with LP & L.

The contract between MP & L and United is analogous to that sued on here in every significant respect. It too was a

19. At trial, LP & L argued that the entire course of conduct engaged in by United during the 1970's (the curtailment proceedings before FERC, the Northern Natural Exchange Agreement, and the distant purchases of gas) constituted a systematic scheme to defraud LP & L. I disagree. The conduct complained of was a desperate response to the lack of gas during that time period.

cost-plus contract [20] that limited the costs United could pass on to MP & L to those of locally acquired gas. *Mississippi Power & Light, supra,* at 619–621. In fact, much of the language of the pricing provision in the MP & L contract is identical to that of Article XIV of the LP & L contract. The only significant difference between the two contracts is that the MP & L contract limits the costs assignable to gas transferred into the Jackson Area. It requires that all gas transferred into the Jackson Area be assigned a cost based on the WAPPOG for the South Louisiana Area. *Mississippi Power & Light, supra,* at 620. Presumably, this single WAPPOG is assigned to all gas transferred into the Jackson Area because all or nearly all the gas transferred into the Jackson Area came from or through the South Louisiana Area. *See* Exhibit A to the MP & L contract (this exhibit is a map identical to that attached to the LP & L contract) (Def.'s Ex. 8–A). So even this is more a difference of degree than kind. As noted above, the LP & L contract also limits the costs assignable by assigning any gas transferred in to an area a WAPPOG based on the cost of gas in the local area from which the gas is transferred. The effect of both provisions is to limit any cost assignable to gas transferred to the cost of local gas.

Two of the costs which United was enjoined from including in its prices to MP & L are identical to those LP & L complains were wrongly included here. In the *Mississippi Power & Light* decision, the Fifth Circuit found that MP & L had a substantial likelihood of success with respect to United's inclusion of costs associated with gas purchased outside areas that correspond to those shown on Exhibit A (including gas associated with the Northern Natural Exchange), and with respect to the transportation of offshore gas from one point on shore to another.

Because the purposes, intentions, and even the language of the MP & L and LP & L contracts are virtually identical, I find that United's inclusion of the two costs noted above in its WAPPOGs to LP & L constituted a reckless disregard for the truth after the date of the Fifth Circuit's decision in the MP & L case. The MP & L decision should have indicated to United that it should back off from its interpretation of the contract it had with LP & L. Although United points out that the Fifth Circuit decision is only preliminary finding, it is a thorough one, and considers issues identical to those presented here. United's continued refusal to consider what effect that decision might have on its relationship with LP & L, or its belief that the two contracts were different enough to warrant its continued inclusion of the above-noted costs in its WAPPOGs to LP & L would, I find, constitute willful and reckless disregard of the truth sufficient to run afoul of 18 U.S.C. § 1341.

In short, hard-nosed business procedure is one thing, but a blindness to obvious truths is another. Although United is, as it insists, entitled to take a position with respect to a contract and litigate that position, it is not entitled to continue in that position after it has had clear, unequivocal indications from the Courts that the interpretation it urges is incorrect. Its willful intransigence in this regard falls below the standard "of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Gregory v. United States,* 253 F.2d 104, 109 (5 Cir.1958). Accordingly, I find that United's inclusion of the two above-noted costs in its bills to LP & L amounted to a violation of 18 U.S.C. § 1341 after May 17, 1985, the date *Mississippi Power & Light Co. v. United Gas Pipe Line Co.* was decided.

---

**20.** United argues that the two contracts differ in that the MP & L contract as amended is a reference price contract and the LP & L contract is a cost based contract. Even assuming this is true, *both* contracts are still cost-plus contracts that call for United to recapture its costs by calculating WAPPOGs and assigning costs. The calculations of the WAPPOGs called for by the contracts are identical in every significant respect.

## B. Prescription

Because the RICO statute does not specify a limitations period for civil actions, the applicable period is that of the most analogous limitations period set by state law. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462, 95 S.Ct. 1717, 1721, 44 L.Ed.2d 295 (1975). This court recently held that civil RICO claims are governed by the one year prescriptive period applicable to fraud actions in Louisiana. *Moore v. A.G. Edwards & Sons, Inc.*, 631 F.Supp. 138, 144 (E.D.La.1986).

The plaintiff's RICO action was filed by an amendment to its complaint on November 25, 1985. Because I found above that United's behavior did not amount to fraud until May 17, 1985, LP & L's RICO claim would only apply to invoices United mailed after that date. Those invoices (there are two of them) were mailed well within the limitations period applicable under *Moore*.

## C. "By Reason Of"

The civil remedy provided by 18 U.S.C. § 1964(c) permits those injured "by reason of" a violation of 18 U.S.C. 1962 to recover. United argues that this language makes a causal connection between LP & L's alleged injury and United's alleged violation of § 1962(a) a necessary element of LP & L's RICO claim. It suggests that LP & L has not shown this connection, and so cannot recover.

United bases its argument on recent cases that construe the RICO statute in light of statements in *Sedima S.P.R.L. v. Imrex*, — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), and *Haroco v. American National Bank of Chicago*, 747 F.2d 384 (7 Cir.1984) to the effect that a RICO

plaintiff can only recover to the extent that he has been injured by conduct that violates § 1962. *Sedima*, 105 S.Ct. at 3285–6; *Haroco*, at 387. It cites two District Court opinions that dismissed civil RICO claims made pursuant to § 1964(c) for alleged violations of § 1962(a), *Gilbert v. Prudential Bache Securities*, Civil Action No. 83–01513, slip op., May 5, 1986, slip op., April 7, 1986 (E.D.Pa.) [Available on WESTLAW, DCTU database], and *Heritage Insurance Co. of America v. First National Bank of Cicero*, 629 F.Supp. 1412, 1417 (N.D.Ill. 1986).

In those cases, the District Courts held that plaintiffs suing under § 1962(a), which prohibits the use or investment in an enterprise of money acquired by racketeering, must show that the injury for which they seek RICO damages was caused by the use or investment of the ill-gotten funds rather than the racketeering itself. *Heritage*, at 1412; *Gilbert*, at 5–6. The argument made on behalf of this interpretation is that a plaintiff is only entitled to recover under § 1964(c) "by reason of" the violation of § 1962(a) it alleges. Therefore, unless the plaintiff can show an injury done to it by virtue of the *use* or *investment* of funds as proscribed by § 1962(a), it cannot recover because it has not been harmed "by reason of" a violation of § 1962(a).[21]

Applying this analysis to the claim made by LP & L, United points out that LP & L has only proved it sustained damages from the overbilling by United; it never showed that United's use or investment of the funds did any additional harm to LP & L. United also argues that LP & L has not shown what quantum of damage it sustained, if any, by United's use and invest-

---

**21.** The Courts and United concede that a suit under § 1964(c) for a violation of § 1962(c) would be different. 18 U.S.C. § 1962(c) prohibits conducting *enterprises* through patterns of racketeering activity, and the only injury contemplated by § 1962(c) is that done by the racketeering itself. *See Sedima*, 105 S.Ct. at 3286. So, if a plaintiff sues under § 1964(c) for a violation of § 1962(c), the argument runs, the plaintiff need only show an injury flowing from racketeering activity (i.e. the predicate acts themselves) to recover. But if he sues for a

violation of § 1962(a) he must show *first* an injury from the racketeering activity (i.e. like any RICO plaintiff, he must show injury from the predicate acts), and *second*, he must show some additional injury flowing from the *use* or *investment* of the funds acquired by the racketeering activity. *See Gilbert*, at 2 (the *Gilbert* Court states "[t]he issue is one of causation, not some special category of injury," but the upshot of its analysis is that a plaintiff must show injuries from both the predicate acts and the use of the funds to recover).

ment of the funds it acquired from LP & L. United urges that this amount would be the only one LP & L could treble under the statute, and argues that LP & L's failure to show any such amount defeats its claim under § 1964(c).

LP & L responds by citing *B.F. Hirsch, Inc. v. Enright Refining Co.*, 617 F.Supp. 49 (D.C.N.J.1985). That case does not squarely hold that the "by reason of" language present in § 1964(c) does not impose a requirement that the § 1962(a) plaintiff prove some injury flowing to it from the use or investment of racketeering proceeds in addition to the damage caused by the predicate acts. But, *in dicta,* it does imply that no such requirement exists. For, after finding that the defendant in *Hirsch* engaged in a pattern of racketeering activity that damaged the plaintiff, and that the defendant invested the proceeds of that activity in itself, the Court stated that the plaintiff had the requisite standing to pursue an action under § 1964(c), finding that the "plaintiff has suffered a racketeering injury by reason of Enright's violation of section 1962(a)." *Hirsch,* at 52. Although the specific argument presented here was never made to the *Hirsch* Court, the cited language implies that if it had been made, it would have been rejected. The *Hirsch* Court's decision that a § 1964(c) action will lie when the elements of § 1962(a) have been satisfied, and its failure to impose an additional causal element (i.e. the requirement that the plaintiff prove that it has been damaged by the defendant's use or investment of its racketeering profits) on the plaintiff before allowing it to recover suggests as much.

The issue presented by the parties here is relatively novel, and one of first impression in the Fifth Circuit. My research discloses that the above-cited cases are the only ones to consider it either directly or indirectly. After carefully considering the arguments of the parties, I find that the plaintiff must prevail.

▆ To read the statute as the defendant does would, I believe, make it virtually impossible for a plaintiff to recover dam-

ages against a corporation for racketeering activity of the kind alleged in this case. It is becoming clear that a corporation cannot be liable for a violation of 18 U.S.C. § 1962(c) because a corporation cannot be both the "person" and "enterprise" contemplated by that subsection of the statute. *See Haroco, supra,* at 402. Subsection (b) of the statute would apply to corporations only in the event that they acquired, controlled, or maintained an interest in an enterprise other than themselves, and subsection (d) would only apply to corporations insofar as they conspired with others to commit a RICO violation. *See* 18 U.S.C. § 1962(b), (d). So, the only subsection of the statute that a plaintiff might use to sue a corporation for its commission of racketeering activity is § 1962(a). That is, the garden variety RICO plaintiff who sues a corporation solely for the effects of its racketeering must rely on § 1962(a) unless it can prove the defendant conspired with others or acquired an interest in the plaintiff.

But if that same plaintiff must show that the defendant's use or investment of racketeering proceeds caused it injury, it will almost never prove a claim against a corporate defendant under § 1962(a). This is so because racketeering proceeds are nearly always cash. Indeed, the statute assumes as much—what else would a defendant invest? Cash, being fungible, is impossible to trace. Once the defendant corporation has acquired cash from the plaintiff, and invested the cash in itself, it is impossible to tell exactly where in the defendant's operation the cash will go, and how it will be spent. Corporate defendants simply do not keep such records, for the good reason that it is unnecessary to worry about where each dollar in a company goes.

The result of this is that the "use or investment" of funds gotten from racketeering activity is never measurable or traceable in a situation like that presently before me, i.e. where the defendant acquires cash by racketeering and invests the cash in itself. Because it is not traceable, no causal connection between the use or

investment of ill gotten cash and an injury to the plaintiff is provable. The defendant argues that this lack of proof should defeat the plaintiff's cause of action, even though § 1962(a) is the plaintiff's only recourse against a single corporate defendant who commits a pattern of racketeering activity against a plaintiff without infiltrating the plaintiff's enterprise.

■ I disagree with the defendant's view because I believe the statute contemplates that corporations should be held liable for the damages provided by 18 U.S.C. § 1964(c) when they are the perpetrators or central figures in a RICO violation. *See Haroco, supra,* at 401; *United States v. Hartley,* 678 F.2d 961 (11 Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). In this case, United was the principal actor in the alleged RICO violation, but if I find that LP & L must perform the impossible task of tracing the funds acquired by United's alleged violation, and that it must then show some additional causal connection or injury resulting from the use or investment of them, LP & L would not stand a chance of proving its case. And because United would not be reachable under any other subsection of the statute, its racketeering would go unpunished. This seems inequitable to me: if United commits racketeering activities, it should not be able to escape RICO damages by investing its RICO profits in itself, or by using them to run its business.

■ Accordingly, I find that United's argument that LP & L was not damaged "by reason of" United's § 1962(a) violation must be rejected. Following *Hirsch,* I find that in order to have standing under § 1964(c) to sue for a violation of § 1962(a) the plaintiff need only show that it was damaged by the racketeering activity of the defendant, and that the defendant used the money it got from the plaintiff in the operation of its business. *Hirsch, supra,* at 52. No additional injury or causal connection to the defendant's violation of § 1962(a) need be shown. To rule other-

wise would emasculate the statute with regard to corporate defendants.

### D. A "Pattern of Racketeering Activity"

■ In a footnote, *Sedima* speculated that the RICO statute's use of the word "pattern" might be the point at which courts could properly narrow the statute's scope by interpretation. *Sedima, supra,* 105 S.Ct. at 3285 n. 14. Since that time, a number of Courts have examined the "pattern" requirement of the statute with varying results. *Compare Northern Trust Bank/O'Hare N.A. v. Inryco, Inc.,* 615 F.Supp. 828, 831 (N.D.Ill.1985), *with Systems Research, Inc. v. Random, Inc.,* 614 F.Supp. 494, 497 (N.D.Ill.1985). Recently, the Fifth Circuit directed its lower Courts to consider more rigorous interpretations of the "pattern" requirement. *Smoky Greenhaw Cotton v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 785 F.2d 1274, 1280 n. 7 (5 Cir.1986). In its brief, United raises this issue, arguing that LP & L has not proven the predicate acts it alleges constitute the "pattern of racketeering activity" necessary to recover under the statute. I note that the issue is particularly acute in this case because I have found that the plaintiff's RICO claim applies to only two of the invoices it sues upon. While a plaintiff must show at least two predicate acts to prove a pattern, two acts alone may not be sufficient. *Sedima, supra,* 105 S.Ct. at 3285 n. 14.

18 U.S.C. § 1961 provides:

"pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

The legislative history of this provision is scant. But the Senate Report on the statute explains:

The concept of "pattern" is essential to the operation of the statute. One isolated "racketeering activity" was thought

insufficient because the net would be too large and the remedies disproportionate to the gravity of the offense. The target of Title IX is thus not sporadic activity. The infiltration of legitimate business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this fact of continuity plus relationship which combines to produce a pattern.

S.Rep. No. 91–617, 91st Cong., 1st Sess. 158 (1969). Thus, "pattern" is understood to have two elements, relationship and continuity. The acts complained of must be related to and similar in purpose, and must be part of an ongoing series of acts, rather than separate incidents in a series of sporadic activities. *See Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257 (8 Cir.1986); *Frankart Distributors, Inc. v. RMR Advertising,* 632 F.Supp. 1198 (S.D.N.Y.1986).

There are essentially three positions presently taken in the Courts as to what the continuity and relationship elements of the "pattern" requirement mean. At one extreme, cases like *Inryco* and *Fulmer* require that the plaintiff prove the defendant was engaged in multiple illegal schemes to satisfy the pattern requirement. *Fulmer,* at 257; *Inryco,* at 833. At the other end of the spectrum are cases that hold that a showing of two related predicate acts is sufficient. *Systems Research, Inc. v. Random, Inc.,* 614 F.Supp. 494 (N.D.Ill.1985). Recently, a compromise position has been explored, in which the Courts require a plaintiff to prove that the defendant engaged in "multiple [criminal] episodes evincing an ongoing practice" of activity. *United States v. Yonan,* 622 F.Supp. 721, 728 (N.D.Ill.1985); *Papai v. Cremosnik, et al.,* 635 F.Supp. 1402 (N.D.Ill.1986). The Fifth Circuit has addressed this issue twice in dicta. In *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (5 Cir.1985), the appellant raised the "pattern" issue for the first time in the appellate court, and the Court stated that proof of two related predicate acts would be enough to constitute a pattern. *R.A.G.S.,* at 1355. More recently, the Circuit has implied that the issue is open, and that something more than simply two related acts may be required. *Smoky Greenhaw, supra,* at 1280 n. 7. Now, after considering the materials submitted by the parties, I find that a compromise position is the right one, and that the plaintiff here has satisfied the statute's requirement of a "pattern of activity."

■ In my opinion, the reading of the statute proposed by *Inryco* and *Fulmer* is clearly wrong. Those cases require that a RICO plaintiff prove that the defendant is involved in multiple criminal schemes to satisfy the pattern requirement. *Fulmer,* at 257; *Inryco* at 833. In other words, those cases hold that a defendant who commits a series of acts in furtherance of a single criminal scheme cannot be sued for RICO damages. Indeed, in *Fulmer,* a case the Court held that unless the plaintiff could show that the defendant was engaged in similar criminal schemes elsewhere, it had not shown the requisite pattern of racketeering activity. *Fulmer,* at 257. In *Inryco,* a case in which the plaintiff alleged the defendant had twice used the mail fraudulently to accomplish a single scheme, the Court observed that a "single scheme does not appear to represent the necessary 'pattern of racketeering activity.'" *Inryco,* at 833; *accord, Frankart Distributors, Inc. v. RMR Advertising,* 632 F.Supp. 1198, 1201 (S.D.N.Y.1986).

The problem I find in these cases is that to require the plaintiff to prove multiple schemes narrows the reach of the statute too far. The *Fulmer* case would require a plaintiff to prove that the defendant had defrauded or intended to defraud not only the plaintiff but others as well. *Fulmer,* at 257. But surely the plaintiff would not have standing to investigate or raise the issue of criminal activities which injure others. Such conduct neither damages nor threatens the plaintiff, and so, is simply not relevant to the plaintiff's suit. And if the plaintiff has no standing to raise the issue, it will never be able to make out a RICO claim under *Fulmer,* because it will never have the opportunity to prove the defendant's criminal injury of third parties. I

refuse to place the RICO plaintiff in such a Catch–22.

Similarly, the *Inryco* case would require that the plaintiff prove at least that the defendant damaged the plaintiff by more than one criminal scheme. So, under *Inryco*, a defendant who mails the plaintiff 10 fraudulent pieces of mail pursuant to a criminal scheme, each of which causes the plaintiff damage, need not fear a RICO action. That is, the loan shark who causes his victim to mail him 10 payments on a single illegal debt would escape RICO liability under *Inryco* so long as he does not force the plaintiff to take out a second loan. I cannot believe that Congress intended this result.

However, I do find that the "two related acts" standard is too lenient. As several courts have noted, most "business transactions involve two or more uses of the mail during negotiations. To hold that two such [acts, which violate the mail fraud statute] are sufficient to constitute a 'pattern of racketeering activity' would be to sweep into federal courts, under RICO, the great majority of actions for fraud in commercial transactions." *Medallion T.V. Enterprises, Inc. v. SelecTV, Inc.*, 627 F.Supp. 1290 (C.D.Cal.1986), *cited by Frankart, supra* at 1201.

The problem that these Courts are trying to address is one inherent in RICO actions predicated on the mail and wire fraud statutes. Those statutes criminalize communications which further an underlying fraud, in addition to those which are in themselves fraudulent. It isn't necessary that the mailed materials themselves be fraudulent, or cause the plaintiff any independent harm to support a prosecution under 18 U.S.C. § 1341. *United States v. Strauss*, 452 F.2d 375, 380 (7 Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972). So almost any communication sent by mail may become a predicate act of mail fraud in a RICO complaint when a later, related transaction turns out to be fraudulent, even though the predicate acts themselves did no separate harm to the plaintiff and were not fraudulent themselves. To

impose the onerous damages provided by RICO in such a situation goes against the grain—RICO is meant to punish those who harm others in a continuous systematic way, not those who harm others only once by a series of actions. When a plaintiff is hurt by one fraud which is only furthered by several mailings rather than hurt by repeated acts of fraud, the Courts are reluctant to impose RICO damages. *Frankart, supra*, at 1201.

█ This problem has led a number of Courts to move toward a position requiring that predicate acts of mail and wire fraud occur in "multiple criminal episodes." *See, e.g., Allington v. Carpenter*, 619 F.Supp. 474, 478 (D.C.Cal.1985); *Frankart, supra*, 632 F.Supp. at 1200–1201; *Papai, supra*, at 1408–09. The exact meaning of the term "multiple criminal episodes" is not clear, but at a minimum it means that the defendant must harm the plaintiff more than once—it must have committed acts which are ongoing, and which have an independent and repeated harmful significance for the plaintiff. *Frankart, id.; Papai* at 1407. That is, a single fraud merely furthered by the mails would not be enough; but a fraudulent scheme committed by sending a series of materials that are themselves fraudulent, with each causing independent harm to the plaintiff, would be. *See Ill. Dept. of Rev. v. Phillips*, 771 F.2d 312, 313 (7 Cir.1985) ("the defendant's mailing of nine fraudulent tax returns to the Illinois Department of Revenue over a nine month period constitutes a pattern of racketeering activity as defined by the statute").

█ I am convinced that this compromise position is the right one. It does not subject businesses that simply use the mail during their negotiations to RICO damages, but it does catch those defendants who implement a single criminal scheme by a series of ongoing, and systematic frauds. Accordingly, I rule that a RICO plaintiff must show that the defendant's actions constituted related, multiple, and ongoing criminal episodes, each with an independent harmful effect, to recover RICO damages.

██ Applying this analysis to the case *sub judice*, I find that United committed a pattern of racketeering activity sufficient to trigger RICO liability. Each of the two invoices it submitted to LP & L after the MP & L decision contained at least two fraudulent representations. Each of the invoices did independent damage to LP & L by causing it to pay a higher price than it negotiated. And United would have continued to send LP & L such invoices if LP & L had not refused to take any more gas. For these reasons, I find that the invoices United sent to LP & L after the MP & L decision were a series of ongoing criminal episodes, with the necessary continuity and relationship to constitute a pattern of racketeering activity for which the plaintiff may recover RICO damages. Accordingly, the plaintiff should recover treble damages for the inclusion of costs associated with gas purchased outside the Exhibit A area, and for the inclusion of costs associated with on shore transportation of offshore gas in its WAPPOGs to LP & L after May 17, 1985. It should also recover reasonable attorney's fees and costs of the suit associated with prosecuting its RICO claim. 18 U.S.C. § 1964(c).

### 5. Pre-Judgment Interest

In its brief, LP & L urges that it should receive prejudgment interest on its claims, because it has been deprived the use of the funds it wrongly paid to United. It argues that it should receive prejudgment interest on its damages from the date each invoice was paid, and on its RICO claim. United responds by arguing that any claim for interest is premature because its counterclaim has not been tried. In the alternative, it suggests that any prejudgment interest due to the plaintiff should run only from the date of judicial demand, or informal demand. It denies that the plaintiff should recover any prejudgment interest on its RICO claim. Because the issue is squarely presented to me and fully briefed, I will decide it now.

Because this is a diversity case, LP & L's right to prejudgment interest on its con-tract claims is determined by Louisiana law. *Plantation Key Developers, Inc. v. Colonial Mortgage Co.*, 589 F.2d 164, 170 (5 Cir.1979). LP & L's claim is one for restitution of payments in excess of the proper purchase price arising under Title V, Chapter 1, Section 3, of the Louisiana Civil Code. La.Civ.Code art. 2301 et seq.

Generally, the Courts have held that interest on such claims runs from the date of the plaintiff's judicial demand for reimbursement, not the date of payment. *Whitehall Oil Co. v. Boagni*, 217 So.2d 707, 713 (La.App. 3 Cir.1968), *aff'd*, 229 So.2d 702 (1969); *Mathews v. Louisiana Health Serv. & Ind. Co.*, 471 So.2d 1199 (La.App. 3 Cir.1985). The reason for this is that such contractual claims only became due upon the defendant's default. To put the defendant in default, the plaintiff must make a demand for payment. LSA—C.C. art. 1911. This usually takes the form of a judicial demand, and so, interest usually runs from judicial demand because that is the date of default in most cases. But some cases sounding in contract have awarded prejudgment interest from the date of a less formal demand for payment, when that demand puts the defendant in default. *Alexander v. Burroughs Corp.*, 359 So.2d 607, 613–614 (La.1978); *Silver v. Nelson*, 610 F.Supp. 505, 525 (E.D.La.1985).

██ I find that LP & L should recover prejudgment interest under the latter line of cases. On September 13, 1984, LP & L gave its audit report to United. That report informed United of all the contract claims decided in LP & L's favor above, and informed United that LP & L considered it in breach of contract. This was sufficient to put United in default with regard to its contract obligations. For this reason, LP & L should recover prejudgment interest for its contractual claims on all invoices before September 13, 1984 from that date at the statutory rate. Prejudgment interest should run from the date of payment on all invoices after that date. The defendant's breach became active rather than passive at that point, and the Code provides that the defendant is in default

(and damages, including interest, are due) in such cases from the date of payment. LSA—C.C. art. 1932; *Andrew Development Corp. v. West Esplanade Corp.*, 347 So.2d 210 (La.1977) (a party who refuses to comply with his contractual obligations actively breaches his contract, and the plaintiff is under no obligation to put him in default to recover).[22]

 Prejudgment interest on the plaintiff's RICO claim is a matter of federal law, which leaves the matter in my discretion. *Canova v. Travelers Ins. Co.*, 406 F.2d 410, 411–12 (5 Cir.), *cert. denied*, 396 U.S. 832, 90 S.Ct. 88, 24 L.Ed.2d 84 (1969). The RICO statute does not provide for the recovery of prejudgment interest, and federal courts have generally refused to award prejudgment interest on claims which provide for multiple damages. They have done so for the sound reason that multiple damages more than reimburse a plaintiff for any loss he suffers from an unavailability of the funds he seeks to recover. *Strobl v. New York Mercantile Exchange*, 590 F.Supp. 875, 882–3 (S.D.N.Y. 1984) (treble recovery in antitrust); *American Timber & Trading Co. v. First National Bank of Oregon*, 690 F.2d 781 (9 Cir.1982) (double recovery under the Na-

tional Bank Act). I see no reason why a RICO claim should be treated any differently, and I refuse to allow the plaintiff any prejudgment interest on its RICO claim.

CONCLUSION

At trial, each of the parties submitted elaborate calculations of the damages that LP & L is entitled to recover in this case. This opinion does not adopt either party's theory completely. The parties are ordered to recalculate LP & L's damages in accordance with the foregoing findings, and to submit to the Court a stipulated amount of damages presently owing to LP & L. If the parties cannot reach such a stipulation, a master will be appointed.

This opinion has also necessarily resolved a number of issues associated with United's counterclaim. The parties are instructed to seek to stipulate to an amount owing to United for LP & L's receipt of gas in excess of United's obligation to deliver, so that a whole judgment can be confected in this matter. If the parties cannot reach such a stipulation, the remaining issues in this case will be tried as soon as possible.

---

**22.** I note that prejudgment interest would run from the date of payment with regard to the invoices sent after May 17, 1985, in any event. *See* LSA–C.C. art. 2311 ("If there be any want of good faith on the part of him who has received, he is bound to restore not only the capital but also the interest on the proceeds from the day of the payment").